ALPHA I, L.P., by and through Robert Sands, a Notice Partner, Plaintiff,

v.

The UNITED STATES, Defendant.

Beta Partners, L.L.C., by and through Alpha I, L.P., a Notice Partner, Plaintiff,

v.

The United States, Defendant.

R, R, M & C Partners, L.L.C., by and through R, R, M & C Group, L.P., a Notice Partner, Plaintiff,

v.

The United States, Defendant.

R, R, M & C Group, L.P., by and through Robert Sands Charitable Remainder Unitrust—2001, a Notice Partner, Plaintiff,

v.

The United States, Defendant.

CWC Partnership I, by and through Trust FBO Zachary Stern U/A Fifth G, Andrew Stern and Marilyn Sands, Trustees, a Notice Partner, Plaintiff,

v.

The United States, Defendant.

Mickey Management, L.P., by and through Marilyn Sands, a Notice Partner, Plaintiff,

v.

The United States, Defendant.

M, L, R & R, by and through Richard E. Sands, Tax Matters Partner, Plaintiff,

v.

The United States, Defendant.

Nos. 06–407 T, 06–408 T, 06–409 T, 06–410 T, 06–411 T, 06–810 T, 06–811 T.

United States Court of Federal Claims.

May 27, 2010.

Lewis S. Wiener, Washington, DC, for plaintiff. N. Jerold Cohen, Thomas A. Cullinan, Joseph M. DePew, and Julie P. Bowling, Atlanta, GA, and Kent L. Jones, Washington, DC, of counsel.

Thomas M. Herrin, with whom were Louise Hytken, Chief, Southwestern Civil Trial Section, Michelle C. Johns, Trial Attorney, Tax Division, United States Department of Justice, Dallas, TX, John A. DiCicco, Acting Assistant Attorney General, and Steven I. Frahm, Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER [1]

HEWITT, Chief Judge.

Before the court are cross motions for summary judgment filed by the United States (United States, government or defendant) and Alpha I, L.P., by and through Robert Sands, a Notice Partner in Alpha I (Alpha or plaintiffs [2]) on the issue of whether,

---

1. The court attaches a Table of Contents at the end of this Opinion and Order. Page numbers keyed to this slip opinion follow each Table of Contents topic line.

2. Throughout the Opinion, the term "plaintiffs" is used to mean the following entities and their members: Alpha I, L.P., by and through Robert Sands, a Notice Partner (Alpha); Beta Partners, L.L.C., by and through Alpha, a Notice Partner (Beta); R, R, M & C Partners, L.L.C., by and through R, R, M & C Group, L.P., a Notice Partner (RRMC Partners); R, R, M & C Group, L.P., by and through Robert Sands, a Notice Partner (RRMC Group); CWC Partnership I, by and through Trust FBO Zachary Stern U/A Fifth G, Andrew Stern and Marilyn Sands, Trustees, a Notice Partner (CWC); Mickey Management, L.P., by and through Marilyn Sands, a Notice Partner (Mickey Management); M, L, R & R by

under § 6662 of the Internal Revenue Code (I.R.C.), plaintiffs are subject to either a 20% negligence penalty or a 20% substantial understatement penalty for any underpayment of tax resulting from plaintiffs' § 465 concession. *See* I.R.C. § 6662.[3]

## I. Background

### A. Procedural Background

Alpha filed a complaint against the United States on May 18, 2006, "petitioning for the readjustment of partnership items that were adjusted by the Internal Revenue Service [ (IRS) ] in a Notice of Final Partnership Administrative Adjustment [ (FPAA) ][4] issued to Alpha with respect to Alpha's Forms 1065 U.S. Return of Partnership Income for the tax years ended December 31, 2001 [ (tax year 2001) ] and December 31, 2002. [ (tax year 2002)]." Complaint [of Alpha] for Readjustment of Partnership Items Under Code Section 6226 (Alpha Complaint or Alpha Compl.), Docket Number (Dkt. No.) 1, 1. By order of February 6, 2007, the court consolidated into Alpha the following cases for pretrial purposes: Beta Partners, L.L.C., by and through Alpha, a Notice Partner (Beta) v. United States; R, R, M & C Partners, L.L.C., by and through R, R, M & C Group, L.P., a Notice Partner (RRMC Partners) v. United States; R, R, M & C Group, L.P., by and through Robert Sands, a Notice Partner (RRMC Group) v. United States; CWC Partnership I, by and through Trust FBO Zachary Stern U/A Fifth G, Andrew Stern and Marilyn Sands, Trustees, a Notice Partner (CWC) v. United States; Mickey Management, L.P., by and through Marilyn Sands, a Notice Partner (Mickey Management) v. United States; and M, L, R & R by and through Richard E. Sands, Tax Matters Partner (MLRR) v. United States. Order of Feb. 6, 2007, Dkt. No. 19. During the years at issue plaintiffs formed and organized eight separate entities: Alpha, Beta, RRMC Partners, RRMC Group, CWC, Mickey, MLRR and R, R, M & C Management Corporation (RRMC Corp.).

The general and tax matters partner in Alpha and RRMC Group at all times was RRMC Corp. Alpha Compl. ¶ 3; United States' Response to Plaintiffs' Proposed Findings of Fact (defendant's Response to Facts or Def.'s Resp. Facts), Dkt. No. 184, ¶ 5. Richard and Robert Sands were the sole shareholders of RRMC Corp. Def.'s Resp. Facts ¶ 7. Richard Sands is listed as the tax matters partner for MLRR, First Amended Complaint [of MLRR] for Readjustment of Partnership Items Under Code Section 6226 (MLRR Amended Complaint or MLRR Amended Compl.), Dkt. No. 103, and Robert Sands is listed as the notice partner for Alpha, First Amended Complaint [of Alpha] for Readjustment of Partnership Items Under Code Section 6226 (Alpha Amended

and through Richard E. Sands, Tax Matters Partner (MLRR); Abigail Trust; and Zachary Trust. Their members, at all relevant times, were Richard Sands (Richard), Robert Sands (Robert), Marilyn Sands (Marilyn). Marilyn is Richard and Robert's mother. Plaintiffs' Response to Defendant's Third Set of Proposed Findings of Uncontroverted Fact (plaintiffs' Response to Third Facts or Pls.' Resp. Third Facts), Docket Number (Dkt. No.) 186, 7. Abigail Trust and Zachary Trust are trusts set up by Laurie Stern for the benefit of her children, Abigail Stern and Zachary Stern. *Id.* at 8. Laurie Stern, who passed away in 1995, is the sister of Robert and Richard, and is the daughter of Marilyn. *Id.* Abigail Stern and Zachary Stern are the niece and nephew of Richard and Robert and the grandchildren of Marilyn. *See id.* The six limited partners of Alpha I, L.P. (Alpha) were Robert, Richard, Marilyn, Andrew Stern, the Marvin Sands Master Trust, and CWC. United States' Response to Plaintiffs' Proposed Findings of Fact (Def.'s Resp. Facts), Dkt. No. 184, 8–9. The general

partner of Alpha was R, R, M & C Management Corp. (RRMC Corp.), *id.* at 9, the sole shareholders of which were Richard and Robert, *id.* at 4. The term "plaintiffs," is used throughout the Opinion to refer to actions of and the transactions orchestrated by Richard, Robert and Marilyn through their participation in various entities.

3. Citations to sections are to the sections of the Internal Revenue Code (I.R.C.), found at Title 26 of the United States Code (2000), in effect in the years at issue in this case. Citations to the Treasury Regulations (Treas.Reg.) are to the regulations found at Title 26 of the Code of Federal Regulations (2000), in effect in the years at issue in this case.

4. Final Partnership Administrative Adjustments (FPAAs) are adjustments to taxes issued by the Internal Revenue Service (IRS). *Cf.* Pls.' Resp. Third Facts 30 (noting adjustments to plaintiffs' taxes made by the IRS in various FPAAs).

Complaint or Alpha Amended Compl.), Dkt. No. 97. As notice partners and tax matters partners, Robert and Richard Sands filed the complaints on behalf of plaintiffs. *See, e.g.,* Alpha Am. Compl.; MLRR Am. Compl. The court will consider the actions of Richard and Robert Sands to determine whether certain defenses to penalties are available to plaintiffs at the partnership level.

The IRS issued FPAAs to plaintiffs that increased plaintiffs' tax liabilities for tax years 2001 and 2002. *See, e.g.,* Alpha Compl. ¶ 35; Plaintiffs' Response to Defendant's Second Set of Proposed Findings of Uncontroverted Fact (plaintiffs' Response to Second Facts or Pls.' Resp. Second Facts), Dkt. No. 119, 36–37. Pursuant to § 6662 of the I.R.C., the FPAAs also asserted a forty percent accuracy-related penalty against plaintiffs or, alternatively, a twenty percent accuracy-related penalty. *Id.; see* I.R.C. § 6662. On May 16, 2008 plaintiffs filed amended complaints containing concessions under § 465(b)(1) of the I.R.C. Dkt. Nos. 97–103. Plaintiffs' amended complaints conceded that taxes are owed but contested whether penalties are owed. *See, e.g.,* Alpha Amended Compl., Dkt. No. 97, ¶¶ 39–44. Defendant characterized plaintiffs' concession as "largely a selfserving maneuver to attempt to avoid the 40% penalty imposed in connection with their use of abusive tax shelters designed to avoid tax on $120,000,000 in gain." United States' Response to Plaintiffs' Motion for Leave to Amend Their Complaints (Def.'s Resp. to Pls.' Mot. to Amend), Dkt. No. 95, 4.

Also before the court are numerous exhibits and appendices that the parties have filed over the course of this litigation, including exhibits and appendices to several motions for summary judgment. On June 4, 2007, the government filed a Motion for Summary Judgment, Dkt. No. 28, and included, as support, Appendix A and B to United States' Motion [for] Summary Judgment in Cause Nos. 06–407, 06–408T, 06–411T, 06–810T, and 06–811T (defendant's First Motion Appendix A or Def.'s First Mot. App'x A and defendant's Motion First Appendix B or Def.'s First Mot. App'x B, respectively), Dkt. Nos. 30–31. On July 6, 2007, plaintiffs filed a response and cross motion for summary judgment, Dkt. No. 35, and included, as support, Appendix A and B to Plaintiffs' Response to United States' Motion for Summary Judgment in Cause Nos. 06–407T, 06–408T, 06–411 T, 06–810T, and 06–811 T and Plaintiffs' Cross Motion for Summary Judgment (plaintiffs' Appendix A or Pls.' App'x A and plaintiffs' Appendix B or Pls.' App'x B, respectively), Dkt. No. 36. Defendant filed Appendix B to United States' Response to Plaintiff[s]' Cross–Motion for Summary Judgment and to Plaintiffs' Reply to United States' Motion for Summary Judgment [in] Cause Nos. 06–407T, 06–408T, 06–411 T, 06–810T, and 06–811 T (defendant's · Response Appendix B or Def.'s Resp. App'x B), Dkt. No. 52, on August 14, 2007. Also before the court is plaintiffs' Response to Second Facts, filed August 4, 2008. The earlier motions for summary judgment are no longer pending and no longer relevant, but the court finds that the exhibits and appendices to these motions continue to be relevant.

Of particular evidentiary importance are certain transcripts filed as Exhibits 26 through 29 to defendant's Response Appendix B (defendant's Exhibit(s) 26–29 or Def.'s Exh(s). 26–29). These transcripts were the subject of Plaintiffs' Motion to Strike (plaintiffs' Motion to Strike or Pls.' Mot. Strike), Dkt. No. 62, filed on September 14, 2007. Plaintiffs' Motion to Strike includes nine supporting exhibits (plaintiffs' Exhibit(s) 1–9 or Pls.' Exh(s). 1–9). Defendant filed United States' Response to Plaintiffs' Motion to Strike (defendant's Response to Motion to Strike or Def.'s Resp. Mot. Strike), including Appendix A to United States' Response to Plaintiffs' Motion to Strike (defendant's Response to Motion to Strike Appendix A or Def.'s Resp. Mot. Strike App'x A), Dkt. No. 75, on October 15, 2007. Plaintiffs filed Plaintiffs' Reply in Support of Plaintiffs' Motion to Strike (plaintiffs' Reply to Motion to Strike or Pls.' Reply Mot. Strike), Dkt. No. 85, on February 29, 2008. In an Order dated October 7, 2009 the court terminated, without prejudice, plaintiff's Motion to Strike, while reserving the right of the parties to revive all outstanding arguments to the extent the arguments later became relevant. Order of October 7, Dkt. No. 178, ¶ 3. The issue is fully briefed, and the parties reference the

transcripts in the cross-motions for summary judgment currently before the court. *See, e.g.,* United States' Third Set of Proposed Findings of Uncontroverted Fact (defendant's Third Set of Facts or Def.'s Third Facts), Dkt. No. 180, ¶ 15; Plaintiffs' Response to Defendant's Third Set of Proposed Findings of Uncontroverted Fact (plaintiffs' Response to Defendant's Third Facts or Pls.' Resp. Third Facts), Dkt. No. 186, 4–6; United States' Reply to Plaintiffs' Response to Defendant[']s Motion For Summary Judgment on Penalties (defendant's Reply or Def.'s Reply), Dkt. No. 189, 2. Because the court finds the transcripts to be relevant to the disposition of the parties' motions for summary judgment, the court addresses, in this Opinion, the issue of whether the transcripts must be stricken from the record. *See infra* Part II.

On July 2, 2008, plaintiffs filed a Motion for Partial Summary Judgment requesting that "[t]he 40 percent gross valuation misstatement penalty (as well as the 20 percent substantial valuation misstatement penalty) asserted by the defendant is inapplicable to plaintiffs as a matter of law because any underpayment of tax would not be 'attributable to' a valuation misstatement, but instead would be attributable to plaintiffs' concession that defendant's capital gains adjustments were correct under Section 465(b)(1) [of the I.R.C.]." Plaintiffs' Motion for Partial Summary Judgment (plaintiffs' Motion for Partial Summary Judgment or Pls.' Mot. for Partial Summ. J.), Dkt. No. 108, 4 ("Here, plaintiffs' concession eliminated the need for the [c]ourt to consider difficult valuation issues relating to basis and economic substance, and defendant cannot require the [c]ourt to make such determinations solely for the purpose of imposing the valuation misstatement penalty."). In the United States' Response to Plaintiffs' Motion for Partial Summary Judgment (defendant's Response to Partial Summary Judgment or Def.'s Resp. Partial Summ. J.), Dkt. No. 115, defendant argued that plaintiffs' § 465 concession does not affect the applicability of penalties. Def.'s Resp. for Partial Summ. J. 5–6. On November 25, 2008 the court granted plaintiffs' Motion for Partial Summary Judgment, finding "that the underpayment of plaintiffs' taxes are not

'attributable to' an overvaluation misstatement." *See Alpha I, L.P. v. United States (Alpha I),* 84 Fed.Cl. 622, 634 (2008).

Defendant filed the United States' Motion to Reconsider Opinion Regarding Plaintiffs' Motion for Partial Summary Judgment (defendant's Motion for Reconsideration or Def.'s Mot. for Recons.), Dkt. No. 147, on December 24, 2008. The court denied defendant's Motion for Reconsideration on March 16, 2009. *Alpha I, L.P. v. United States (Alpha II),* 86 Fed.Cl. 568, 570 (2009). The parties filed a Joint Status Report (JSR) with the court on April 28, 2009, Dkt. No. 164, in which they disputed "whether 'reasonable cause' and 'substantial authority' defenses can be brought based on basis adjustments made under section 752 of the [I.R.C.]." Order of Apr. 28, 2009, Dkt. No. 165, 1 (citing JSR 2–5). The court ordered "briefing on how plaintiffs' earlier concessions under section 465 may affect the types of evidence that may now be presented in this case." *Id.* at 4. The court determined that, because plaintiffs conceded their tax liability under § 465, and therefore avoided the application of valuation misstatement penalties that may have applied had the court been required to decide all grounds alleged for plaintiffs' tax liability, *see Alpha I,* 84 Fed.Cl. at 631–32, "plaintiffs are limited to asserting defenses based on the ground under which plaintiffs made their concessions— § 465 of the I.R.C." *Alpha I, L.P. v. United States (Alpha III),* 89 Fed.Cl. 347, 357 (2009). Further, because the court has already determined that valuation misstatement penalties do not apply, *Alpha I,* 84 Fed.Cl. at 631–34, a decision on penalties will not encompass valuation misstatement penalties, *Alpha III,* 89 Fed.Cl. at 360. The court also declined to hold that plaintiffs are judicially estopped from contesting the 20% negligence and substantial understatement penalties. *Id.* at 362.

### B. Pending Motions

On December 7, 2009 the government filed United States' Motion for Summary Judgment on Penalties (defendant's Motion or Def.'s Mot.), Dkt. No. 179, accompanied by defendant's Third Set of Facts, Dkt. No. 180.

Also on December 7, 2009 plaintiffs filed Plaintiffs' Motion for Partial Summary Judgment Regarding the Applicability of the Negligence and Substantial Understatement Penalties (plaintiffs' Motion or Pls.' Mot.), Dkt. No. 181, accompanied by plaintiffs' Proposed Findings of Uncontroverted Facts (plaintiffs' Facts or Pls.' Facts), Dkt. No. 182.

On January 7, 2010 the government filed United States' Response to Plaintiffs' Motion for Partial Summary Judgment Regarding the Applicability of the Negligence and Substantial Understatement Penalties (defendant's Response or Def.'s Resp.), Dkt. No. 183, accompanied by United States' Response to Plaintiffs' Proposed Findings of Fact (defendant's Response to Plaintiffs' Facts or Def.'s Resp. Facts), Dkt. No. 184. Also on January 7, 2010 plaintiffs filed Plaintiffs' Response to Defendant's Motion for Summary Judgment on Penalties (plaintiffs' Response or Pls.' Resp.), Dkt. No. 185, accompanied by Plaintiff's Responses to United States' First Set of Interrogatories (plaintiffs' Responses to Interrogatories or Pls.' Resp. to Interrogs.), Dkt. No. 185–2 and plaintiffs' Response to Defendant's Third Facts. On February 4, 2010 the government filed defendant's Reply. Also on February 4, 2010 plaintiffs filed Plaintiffs' Reply in Support of Plaintiffs' Motion for Partial Summary Judgment on Penalties (plaintiffs' Reply or Pls.' Reply), Dkt. No. 190.

## C. Factual Background

The dispute now before the court is whether plaintiffs are subject to an accuracy-related penalty under § 6662 of the I.R.C. Specifically, defendant asserts that plaintiffs engaged in two Son of BOSS tax shelters,[5] Def.'s Mot. 3, and that the 20% substantial understatement penalty and the 20% negligence penalty apply to any understatement of tax, id. at 8, 14. Plaintiffs assert that the substantial understatement and negligence penalties are inapplicable because the plain-

tiffs had substantial authority for the position in their initial returns and because they relied in good faith on the advice of tax professionals. Pls.' Mot. 1–2. Because the determination of the parties' disputes requires the court to determine whether plaintiffs were engaged in a tax shelter, whether the substantial understatement or negligence penalties are applicable to plaintiffs, and whether plaintiffs had substantial authority for the position taken, the following uncontested facts[6] provide relevant context. Further to its limited jurisdiction, the court will consider the availability of penalties and defenses only as they relate to the partnership, rather than to individual partners. Jurisdiction of the court is discussed below. See infra Part III.A.

### 1. The Heritage Discussions

Chester Decker (Mr. Decker), an employee of Heritage Organization, LLC (Heritage), made a telephone call to Richard Sands (Richard) in early May 2001, to discuss an investment strategy to reduce federal and state capital gains. Pls.' Resp. Third Facts 19. After the conversation, Richard and Robert Sands (Robert) met with Heritage personnel at least three times to discuss further the investment strategies promoted by Heritage. See id.; Pls.' Resp. Second Facts 8. After meeting with Heritage employees, plaintiffs decided to engage in a short sale of United States Treasury Notes (Treasury Notes) and were advised and assisted by Heritage in this transaction. Pls.' Resp. Third Facts 19. Heritage's fee was based on the tax consequences of the investment: Heritage was paid 25% of the projected current and future taxes that plaintiffs would have incurred but for implementation of Heritage's investment plans. Id.

The parties disagree about the content and the purpose of the meetings between Richard and Robert Sands and employees of Heri-

---

**5.** "BOSS stands for Bond and Option Sales Strategy," and is discussed in greater detail in Part IV.B.1. See United States' Motion for Summary Judgment, Dkt. No. 179, 3 & n. 3. A partnership is engaged in a tax shelter "if a significant purpose of such partnership ... is the avoidance or evasion of Federal income tax."

I.R.C. § 6662(d)(2)(C)(ii). Tax shelters are discussed generally in Part III.C.4.

**6.** When the court cites a fact to the filings of only one party, that fact does not appear on the record to be contested. See Rules of the Court of Federal Claims (RCFC) 56(e)(2).

tage. Defendant asserts that "[d]uring these meetings, Richard and Robert [Sands] discussed the elimination of capital gains tax. Specifically, Robert and Richard's goal was to eliminate the capital gains that would result from their sale of Constellation brand stock." Def.'s Third Facts ¶ 15. Plaintiffs assert that the conversations do not accurately or completely reflect the conversations plaintiffs had with employees of Heritage and assert that plaintiffs engaged in plans with Heritage for the purpose of "tax savings ... diversification of asserts, [and] ... family estate planning." Pls.' Resp. Third Facts 11. *But see, e.g.,* Pls.' Mot. Strike, Exh. 5 (Robert Sands Dep.), 35:3–18 (stating that he could not remember what was discussed in conversations); Def.'s Resp. Mot. Strike Exh. 5 (Richard Sands Dep.), APP–A–42, 33:7–34:2 (same).

After meeting with Heritage employees to discuss investment strategies that would reduce taxes on federal and state capital gains, plaintiffs were advised and assisted in implementing these transactions by Heritage employees. Def.'s Third Facts ¶ 14; Pls.' Resp. Third Facts 9. Heritage's strategy involved short sales of securities. A short sale is a sale of securities that are not owned by the seller. *Provost v. United States,* 269 U.S. 443, 450–51, 46 S.Ct. 152, 70 L.Ed. 352 (1926). Securities are borrowed, generally from a brokerage house, and then sold on the open market. *Kornman & Assocs., Inc. v. United States,* 527 F.3d 443, 450 (5th Cir. 2008). The seller takes any proceeds made from the sale and replaces the borrowed securities at a future date, closing out the short sale. *Id.* If the securities decrease in value over the course of the transaction, the seller makes a profit. *Id.*

### 2. The First Transaction

On August 21, 2001, Robert, Richard, Marilyn Sands (Marilyn), the Abigail Trust and

the Zachary Trust each opened brokerage accounts with UBS Paine Webber, Inc. (Paine Webber). Pls.' Resp. Second Facts 19; Pls.' Resp. Third Facts 11. Two days later, Robert, Richard, Marilyn, the Abigail Trust and the Zachary Trust borrowed Treasury Notes from Paine Webber and sold them on the open market in the first short sale transaction. Def.'s Third Facts ¶¶ 16–17; Pls.' Resp. Third Facts 12.

On August 23, 2001 Richard and Robert, as sole shareholders, incorporated RRMC Corp. *See* Pls.' Resp. Second Facts 21; Pls.' Resp. Third Facts 12. Also on August 23, 2001 RRMC Group was formed. Pls.' Resp. Second Facts ¶ 17. RRMC Group's general partner was RRMC Corp. and its limited partners were Robert, Richard, Marilyn and CWC. *Id.* CWC is a general partnership, and its partners are Richard, Robert, Abigail Trust and Zachary Trust. *Id.* at 21. Also on August 23, 2001, RRMC Partners was organized, consisting of Gloria Robinson and RRMC Group. *Id.* at 21–22.

On August 28, 2001 Robert, Richard, Marilyn and CWC (collectively, the Sands) contributed cash and 2,002,002 shares of Constellation stock[7] to RRMC Group for a combined interest of 99.99%. Def.'s Resp. Facts 22–23; Pls.' Resp. Second Facts 22–23. RRMC Corp. contributed Class A stock of Constellation for the remaining 0.1% interest in RRMC Group, as its general partner. Def.'s Resp. Facts 5. The sole shareholders in RRMC Corp. were Richard and Robert. *Id.* at 4. As of August 28, 2001, RRMC Group was entirely controlled by plaintiffs.

The interests in the proceeds of the short sale and the obligation to cover the short sale follow a similarly complex path. On August 27, 2001 the Abigail Trust and the Zachary

---

**7.** As of July 31, 2001, CWC, Robert, Richard and Marilyn (collectively the Sands), owned 11% of the outstanding Class A Shares of Constellation stock and 93% of the Class B Shares of Constellation stock. United States' Third Set of Proposed Findings of Uncontroverted Fact (Def.'s Third Facts), Docket Number (Dkt. No.) 180, ¶ 13. The Sands' interests encompassed 62% of Constellation's voting shares and 22% of the outstanding equity in Constellation. *Id.* Constella-

tion was involved in the production and marketing of alcohol products in North America and the United Kingdom during the period at issue. *Id.* ¶ 1. Constellation's gross sales exceeded $3 billion for the company's fiscal year ending February 28, 2001. *Id.* ¶ 2. In 2001, plaintiffs, as a group, owned a sufficient number of shares to determine the outcome of corporate transactions submitted to Constellation's shareholders for approval. *Id.* ¶ 11.

Trust assigned their respective interests in their Paine Webber accounts to CWC and delegated to CWC the responsibility to cover their portions of the short sale. Pls.' Resp. Second Facts 20. On August 28, the Sands each made partnership contributions to RRMC Group of 500,000 shares of Constellation stock as well as the value of the Paine Webber accounts, *id.* at 22–23, and delegated the obligation to cover the short sales to RRMC Group, *id.* at 23. On August 31, 2001 RRMC Group contributed all of its shares of Constellation stock and the entirety of the Paine Webber accounts to RRMC Partners for a 99.7163% interest in RRMC Partners. *Id.* Gloria Robinson contributed $250,000 for a .2837% interest in RRMC Partners. *See id.* On September 6, 2001, RRMC Partners closed the short sales and recognized a loss of $425,565. *Id.* On September 10, 2001 RRMC Group purchased Gloria Robinson's interest in RRMC Partners, which had the effect of terminating RRMC Partners and distributing RRMC Partners' assets to RRMC Group and giving plaintiffs complete control of RRMC Partners' assets. *Id.* at 23–24.

On September 21, 2001 the Sands transferred their respective interests in RRMC Group to four charitable remainder unitrusts (the CRUTS), with each grantor designated as the recipient of the annual payment. *Id.* at 24. On October 1, RRMC Group sold the 2,002,002 shares of Constellation stock for $74,862,863. *Id.* at 25. Plaintiffs initially reported that the carryover basis in the Constellation stock at the time of the sale was $94,757,364. *Id.* Plaintiffs did not deduct the obligation to cover the short sale as a liability in computing basis because they initially asserted that the obligation to cover the short sale was a contingent obligation and was not the type of liability that is required to be reported. *See* Pls.' Mot. 4. Because RRMC Group counted the proceeds from the short sale as basis, but did not list the corresponding obligation to cover the short sale as a liability, plaintiffs' tax returns originally asserted that the basis in RRMC Group was $94,757,365 and that the sale of Constellation stock for $74,862,863 resulted in a capital loss of $19,894,501. *See id.;* Pls.' Resp. Second Facts 25, 30. Plaintiffs do not now contest

the government's conclusion that RRMC Group had a long-term capital gain of $65,539,019 instead of a net long-term capital loss of $19,890,987 as a result of this sale. Pls.' Resp. Second Facts 28.

### 3. The Second Transaction

In December 2001 certain Sands family members formed Alpha. Def.'s Resp. Facts 8–9; *see also supra* note 2. In that same month plaintiffs each executed a second short sale of Treasury Notes, again through their respective Paine Webber accounts. *Id.* at 9–10. Abigail Trust and Zachary Trust again transferred the proceeds of the short sales and the obligation to cover the short sales to CWC two days after executing the short sales. *Id.* at 10. On December 17, 2001 each of the Alpha limited partners transferred various sums of cash as well as the obligation to cover the short sales to Alpha in exchange for interests in the partnership. *Id.*

On December 17, 2001 Alpha purchased 67,525 shares of stock of Corning, Inc. (Corning) for a total cost of $595,570.50. Pls.' Resp. Third Facts 21. Also, on December 17, 2001, Alpha purchased 33,400 shares of stock of Yahoo, Inc. (Yahoo) at $17.95 per share, for a total cost of $599,530. *Id.* On December 20, 2001 Alpha contributed shares of Corning and Yahoo stock, proceeds from the second short sale and cash in exchange for a 99.034% interest in Beta. *Id.* Gloria Robinson held the remaining .966% interest in Beta. *Id.; see also* Def.'s Resp. Facts 11. On December 27, 2001 Beta closed the second short sale for a gain of $90,018. Pls.'s Resp. Third Facts 22. That same day, Alpha purchased Gloria Robinson's interest in Beta. *Id.*

When Alpha purchased Gloria Robinson's interest, it acquired 100% of Beta, resulting in a deemed liquidation of Beta. *Id.* After the deemed liquidation, Alpha held an aggregate adjusted tax basis in the Yahoo stock of $22,262,094 and an aggregate adjusted tax basis in the Corning stock of $23,230,361. *Id.* at 22–23. During 2001 and 2002 Alpha transferred most of the Yahoo stock and Corning stock to its partners, who then transferred it to MLRR and to Mickey Man-

agement. *Id.* at 24, 26. On December 18, 2002 Alpha, MLRR and Mickey Management each sold its Corning stock and its Yahoo stock. *See id.* at 26.

Beta did not include the obligation to cover the second short sale as a partnership liability on the partnership tax return. *Id.* at 24–25. Plaintiffs assert that the non-inclusion reflected the proper characterization of the transaction under the I.R.C. *Id.* at 24. Defendant asserts that by failing to recognize the obligation of the second short sale, plaintiffs artificially increased their basis in the Yahoo and Corning stock by 3000%. *Id.* Neither Alpha nor CWC included the obligation to cover the second short sale as a partnership liability on its tax return. *Id.* at 25.

### 4. The FPAAs and Plaintiffs' Concessions

On December 22, 2005, the IRS issued notices of FPAAs of Alpha's partnership items for the 2001 and 2002 tax years and for Beta's partnership items for the short period ending December 27, 2001. *Id.* at 28. The primary adjustment on both the Alpha and Beta FPAAs, which plaintiffs now agree to, was an adjustment to capital gains and losses, including an increase in partnership liabilities by the aggregate amount of $44,293,087. Alpha Am. Compl. ¶¶ 39–44; Pls.' Resp. Third Facts 28. On December 28, 2005 the IRS issued an FPAA for fiscal year 2001 to CWC. The primary adjustment in the FPAA was to increase the partnership liabilities of CWC by $21,032,464. *Id.* Plaintiffs now agree to the adjustment in capital gains and losses contained in the CWC FPAA, including the adjustment to partnership liabilities. *Id.* On September 6, 2007, the IRS issued FPAAs to Mickey Management and to MLRR regarding tax year 2002. *Id.* at 30. The primary adjustment in the FPAAs was to disallow capital losses claimed by the partnerships in 2002 for failure to recognize adjusted bases in Yahoo and Corning stock. *Id.*

In December 2005, the government issued three more FPAAs, *id.* at 15–17, the first to RRMC Group, adjusting RRMC Group's reported basis for tax year 2001 in the Constellation stock from $94,538,125 to $9,108,119,

resulting in a long-term capital gain of $65,539,019 and a reduction in short-term capital loss of $219,239, *id.* at 15. The government issued a second FPAA, increasing RRMC Partners' liabilities by $85,649,245 and disallowing the $424,565 loss claimed on the closing of the first short sale. *Id.* at 16. The government issued a third FPAA, reducing the capital contribution by CWC by $21,032,464 and increasing CWC's partnership liabilities by the same amount. *Id.* at 16–17. Plaintiffs conceded these capital gains on the grounds that "none of the transactions increased the amount considered at risk for an activity under … [§ ] 465(b)(1)." *Id.* at 16–17. Plaintiffs amended their complaints in April 2008 to concede each of the capital gains adjustments asserted by defendant. *See* Def.'s Resp. Facts 15–16.

In RRMC Group's Amended Complaint for Readjustment of Partnership Items Under Code Section 6226 (RRMC Group Amended Complaint or RRMC Group Am. Compl.), Dkt. No. 100, RRMC Group conceded that the first transaction should have resulted in a long-term capital gain of $65,539,019. RRMC Group Am. Compl. ¶ 37; Pls.' Resp. Second Facts 38. In their Response to Defendant's Third Facts, plaintiffs generally agreed with defendant's characterization of the IRS adjustments:

> Plaintiffs no longer claim that the CRUT Shelter transaction increased the amount considered at risk for an activity under Code Section 465(b)(1) and, for this reason, do not object to the IRS adjustment that Group has a net short-term capital loss of $(207,636) instead of $(426,875) and a long-term capital gain of $65,539,019 instead of the $(19,890,987) net long-term capital loss reported on Group's return. Instead, plaintiffs concede the correctness of these specific adjustments proposed by the IRS in the FPAAs.

Pls.' Resp. Third Facts 17 (citing RRMC Group Am. Compl. ¶ 37). However, plaintiffs note their disagreement with "defendant's characterization of the transactions engaged in by plaintiffs as tax shelters." *Id.*

Further to their concession, plaintiffs agree with the following: that Mickey Management has a net short-term capital gain of

$69,540 instead of a net short-term capital loss of $2,964,879, as was reported on Mickey Management's returns, *id.* at 13; that MLRR has a short-term capital loss of $1,241,541 instead of a net short-term capital loss of $4,275,885, as was reported on MLRR's return, *id.*; that Alpha has a short-term capital gain of $355,374 instead of a net short-term capital loss of $3,140,776, as was reported on Alpha's return, *id.*; and that their capital gains were correctly adjusted on the ground "that none of the transactions of the partnerships increased the amount considered at-risk for an activity under Section 465(b)(1) and that the at-risk rules would disallow losses and require the partnerships and their partners to recognize gain on the transactions as set forth in the FPAA[ ]," Def.'s Resp. Facts. 16 (disputing only whether the application of I.R.C. § 465 is a partner-level determination).

### 5. The Lewis Rice Opinion Letters

In implementing both of the transactions set up by Heritage, plaintiffs engaged Lewis, Rice & Fingerish, L.C. (Lewis Rice) to provide legal services and tax opinions relating to the transactions. Pls.' Resp. Third Facts 32. There is nothing in the Lewis Rice opinion letters relating to § 465, the section under which plaintiffs conceded defendant's adjustments. *Id.* Plaintiffs assert that there is nothing in the opinion letters about § 465 because Lewis Rice did not believe that § 465 was applicable to the transaction. *Id.* Regardless of the reason, nothing in the record discloses any opinion of Lewis Rice on the effect that § 465 may have had on plaintiffs' transactions. *See id.*

Defendant asserts that plaintiffs did not solicit advice from Lewis Rice to determine the correct tax treatment of the transactions; instead, defendant contends that "the tax opinions were solicited with the sole intent of obtaining a letter that agrees with the transaction proposed by Heritage." Def.'s Resp. Fact 17. Further, defendant contends that Lewis Rice was instrumental in structuring the transactions as tax shelters. *Id.* at 18. Defendant also asserts that the factual representations plaintiffs made to Lewis Rice contained material misrepresen-

tations. *Id.* at 17. Defendant contends that "[t]he [s]ervices rendered by Lewis Rice, including preparing opinion letters, were part of a prearranged agreement with the Sands and Heritage to facilitate, and implement, the Heritage shelters," and "the opinion letters constitute nothing more than window dressing." *Id.* at 19.

## II. Motion to Strike

Plaintiffs filed a Motion to Strike, which the court terminated, without prejudice, pending a determination of whether the parties' dispute concerning the admissibility of transcripts of conversations between Richard and Robert Sands and certain Heritage employees remained relevant in light of the narrowed issues. *See* Order of Oct. 7, 2009, Dkt. No. 178. In their Motion to Strike, plaintiffs assert that the transcripts should be excluded because they have not been and cannot be authenticated, Pls.' Mot. Strike 6–10, and because they contain inadmissible hearsay, *id.* at 11–15. Plaintiffs also argue that the transcripts should be excluded as a discovery sanction under RCFC 37(c) because defendant delayed too long before disclosing the transcripts to plaintiffs. *Id.* at 15–18. Defendant asserts that there is evidence sufficient to support a finding that the transcripts are what the proponent claims, and therefore may be authenticated. Def.'s Resp. Mot. Strike 2–7. Defendant also asserts that the transcripts are admissible as admissions by a party opponent, meet hearsay exceptions as business records and as then-existing mental or emotional condition (evidence of plan or intent) and because the transcripts are not offered to prove the truth of the matters asserted. *Id.* at 8–17 (citing Fed.R.Evid. 801(d)(2), 803(3), 803(6)). Finally, defendant asserts that the transcripts should not be stricken as a sanction because plaintiffs would not be unfairly prejudiced by their admission and the timing of their disclosure was reasonable. *Id.* at 17–24.

### A. Background

At issue are transcripts of conversations between Richard and Robert Sands, and Heritage employees. Pls.' Mot. Strike 2; see Pls.' Resp. Third Facts 9. The transcripts

were made by Heritage employees and "defendant obtained access to these transcripts and other Heritage documents on November 29, 2007 pursuant to an IRS summons served on the bankruptcy trustee for Heritage." Pls.' Mot. Strike 2–3. The documents that were turned over to the bankruptcy trustee were required to be reviewed and segregated by the IRS to avoid the impermissible disclosure of privileged information. See *id.* at 3; Def.'s Resp. Mot. Strike 18–19. As a result of those procedures, counsel for defendant did not see the transcripts until July 2007. Pls.' Mot. Strike 3; Def.'s Resp. Mot. Strike 19. Defendant produced the transcripts to plaintiffs on July 31, 2007. Pls.' Mot. Strike 3; Def.'s Resp. Mot. Strike 19.

Defendant's Exhibit 26, found at defendant's Response Appendix B, APP–B–1 to–13, (defendant's Exhibit 26 or Def.'s Resp. App'x B, Exh. 26), is a transcript of a telephone conversation between Richard Sands and Mr. Decker, a Heritage employee. Def.'s Resp. Mot. Strike Exh. 1 (Decker Dep.), APP–A–11 to –12, 28:23–29:1 ("Q: Okay. And after reviewing [the transcript] does it correlate with your—or does it—with your memory of the conversation that you [had] with the Sands? A: It does."); *see* Pls.' Mot. Strike 4 (acknowledging that the "transcript captured the gist of the conversation"). Defendant's Exhibit 27, found at defendant's Response Appendix B, APP–B–14 to –47, (defendant's Exhibit 27 or Def.'s Resp. App'x B, Exh. 27), is a transcript of a meeting between Richard Sands, Robert Sands and Tim Seaberg (Mr. Seaberg), a Heritage employee. Def.'s Resp. Mot. Strike Exh. 2 (Seaberg Dep.), APP–A–20, 28:17–21 ("Q: Okay. I hate to hit you cold on this thing, but if you'd take a look at this and tell me if there's any reason why you would think this is not a transcription of the meeting that you had on May 31st with Richard Sands? A: It seems like—I don't see any reason so far."). Defendant's Exhibit 28, found at de-

fendant's Response Appendix B, APP–B–48 to –99, (defendant's Exhibit 28 or Def.'s Resp. App'x B, Exh. 28), is a transcript of a meeting between Richard and Robert Sands, Mr. Seaberg and Gary Kornman (Mr. Kornman). Pls.' Mot. Strike 4; see Pls.' Mot. Strike Exh. 3 (Seaberg Dep.), 128:6–9 ("Q: But what she transcribed, you heard as well, correct. A: Yes. [The transcription is] correct up to about 90 percent. There [were] a couple of things that I wasn't 100 percent sure [about]. I'd say 90 percent. Q: Anything that you think would materially alter this transcription? A: Probably not."). Defendant's Exhibit 29, found at defendant's Response Appendix B, APP–B–100 to –130, (defendant's Exhibit 29 or Def.'s Resp. App'x B, Exh. 29), is a transcript of a meeting between Mr. Seaberg, Mr. Kornman, Richard Sands, Robert Sands and the Sands' attorney, Mr. Locke. See Pls.' Mot. Strike 5.

Plaintiffs assert that the transcripts should be excluded from consideration because "the transcripts ... contain indications that individuals were cross-speaking or question marks for words, phrase, sentences, or paragraphs that the transcribers could not understand." Pls.' Mot. Strike 5. Further, plaintiffs contend that the transcripts do not provide the whole picture of the Sands' discussions and negotiations with Heritage and therefore should be excluded. *Id.* Defendant asserts that the transcripts should be considered, and further contends that the "transcribed conversations established that the Sands family was tax shelter shopping for a vehicle which would eliminate the tax on their capital gains." Def.'s Resp. Mot. Strike 1. Defendant offers the transcripts "to counter plaintiffs' contention that plaintiffs acted reasonably in implementing the tax shelters...." *Id.* The court must decide whether the transcripts may properly be admitted as evidence in a motion for summary judgment and, if the transcripts may be admitted, for what purpose.[8]

---

8. Because cases in the United States Court of Federal Claims do not have juries, there is no danger that a jury will confuse a permissible use of statements—their bearing on plaintiffs' state of mind and on then-existing mental or emotional condition (a plan or intent)—with an impermissible use—for the truth of the matter asserted.

The effect on the hearer is relevant to the court's inquiry into the good faith of plaintiffs, *see infra* Parts IV.A.3, B.4, whereas the truth of the matters asserted, that the tax strategies offered by Heritage would work in the manner claimed, is irrelevant. The court will consider the statements only for the effect they may have had on

B. Legal Standards

 When considering a motion for summary judgment, the court may consider evidence, even if it is in a form that would not be admissible at trial. *Celotex Corp. v. Catrett (Celotex)*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). At the summary judgment stage, hearsay evidence may be considered, provided that the out-of-court declarant would be available to testify as to the evidence at trial. *Tatum v. Cordis Corp.*, 758 F.Supp. 457, 463 (M.D.Tenn.1991). Evidence that would otherwise be inadmissible as hearsay may also be considered on summary judgment if the evidence is corroborated or the court concludes that it is sufficiently reliable. *DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.*, 899 F.Supp. 91, 94 (N.D.N.Y. 1995).

> [A]t the summary judgment stage, the focus is not on the form of the evidence ... but rather, whether at trial the matter stated in the affidavit would constitute admissible evidence. To be acceptable at the summary judgment stage, the evidence presented in the affidavit must be evidence that would be admissible if presented at trial through the testimony of the affiant as a sworn witness.

*Found. of Human Understanding v. United States*, 88 Fed.Cl. 203, 228 n. 19 (2009) (quoting 11 James Wm. Moore, *Moore's Federal Practice* § 56.14[1][d], at 56–162.1–163 (3d ed.2004)). "[I]f an affidavit points to the testimony of another witness or source of competent evidence, this may demonstrate the existence of sufficient evidence available at trial to defeat the summary judgment motion." 11 Moore, *supra*, § 56.14[1][d], at 56–164.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). Hearsay is inadmissible except to the extent allowed by the Federal Rules of Evidence. Fed.R.Evid. 802. A statement that is offered against a party and is the party's own statement, or that has been adopted by the party, is admissible as a party admission and is not hearsay. Fed. R.Evid. 801(d)(2)(A)-(B). A record kept in the course of a regularly conducted business activity is admissible as an exception to hearsay if the record was kept in the ordinary course of business and it was the regular practice of that business to make such records, all of which must be demonstrated by a qualified witness. Fed.R.Evid. 803(6); *see Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed.Cir.1996). Statements that are not offered for the truth of the matter asserted are not hearsay. *Cf.* Fed.R.Evid. 801(c) (defining hearsay as statements offered for truth of the matter asserted).

 At trial, a witness is allowed to consult material that would be inadmissible as evidence for the purpose of refreshing recollection. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc. (20th Century)*, 747 F.2d 81, 93 n. 17 (2d Cir.1984) (approving use by plaintiff of taped conversation between its lawyer and witness, despite ethical obligations, and stating that the canons of ethics do not determine what will jog a witness's memory); *United States v. Heath*, 580 F.2d 1011, 1020 (10th Cir.1978) (permitting use of a hearsay statement to refresh witness's recollection). Information that is used to refresh a witness's recollection does not need to be authenticated and does not require a hearsay exception, because the information is not itself being offered as evidence. *See* Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 6:93 (3d ed.2009).

 Evidence must be authenticated prior to admission. Fed.R.Evid. 901(a). Authentication "as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* The standard for authentication is that " 'the possibilities of misidentification and adulteration must be eliminated, not absolutely, but as a matter of reasonable probability.' " *United States v. Haldeman*, 559 F.2d 31, 107 (D.C.Cir.1976) (internal brackets omitted)

the hearers, not for the truth of matters asserted in the statements.

(quoting *Gass v. United States*, 416 F.2d 767, 770 (D.C.Cir.1969)). The United States Court of Appeals for the Tenth Circuit has specifically "rejected the adopted of an 'inflexible [foundation] criteria'" and ruled that the trial court should be given flexibility to determine if a transcript of a recorded conversation can be authenticated. *United States v. Jones*, 730 F.2d 593, 597 (10th Cir. 1984) (citing *United States v. Smith*, 692 F.2d 693, 698 (10th Cir.1982)).

### C. Admissibility for Summary Judgment

Plaintiffs assert that "[t]he Court of Federal Claims excludes evidence that would not be admissible at trial." Pls.' Reply Mot. Strike 1. Plaintiffs cite *Coast Federal Bank v. United States (Coast Federal)*, 48 Fed.Cl. 402, 444–50 (2000), *aff'd en banc*, 323 F.3d 1035 (Fed.Cir.2003), in support of the proposition that the form of evidence at summary judgment must be in a form admissible at trial. Pls.' Reply Mot. Strike 1. However, the *Coast Federal* court relied on *Celotex* for the assertion that "'[e]vidence introduced in support of a motion for summary judgment need not ... be submitted in a form that would be admissible.'" 48 Fed.Cl. at 445 (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). Further, "A party need not demonstrate the admissibility of 'every piece of evidence supporting factual assertions' in summary judgment proceedings." *Id.* (quoting *Cedar Lumber, Inc. v. United States*, 857 F.2d 765, 769 (Fed.Cir.1988)). The court concludes that it may consider evidence even if it is not in a form admissible at trial.

█ Mr. Decker and Mr. Seaberg were both employees of Heritage and each met with plaintiffs to sell plaintiffs tax services offered by Heritage. Pls.' Resp. Second Facts 11. Mr. Decker and Mr. Seaberg were both deposed regarding the conversations memorialized in the transcripts. *See* Pls.' Mot. Strike, Exhs. 2–3; Def.'s Resp. Mot. Strike, Exhs. 1–2. Mr. Decker and Mr. Seaberg were deposed in connection with pretrial proceedings in this case, *see* Pls.' Mot. Strike, Exhs. 2–3; Def.'s Resp. Mot. Strike, Exhs. 1–2, and neither party has asserted that they would be unavailable if they were called as witnesses during trial. Further, Mr. Decker and Mr. Seaberg would be permitted under the Federal Rules of Evidence to consult the transcripts during trial to refresh their recollections. *See 20th Century*, 747 F.2d at 93 n. 17.[9] The court need not determine whether the transcripts in their current form would be admissible as evidence. The court needs to determine only whether the transcripts accurately conveyed the substance of the statements made by Mr. Decker and Mr. Seaberg and heard by Robert and Richard Sands.

The context of plaintiffs' actions bears on several defenses plaintiffs have raised to the accuracy-related penalties of § 6662. *See* Pls.' Mot. 8. Two of those defenses, the reasonable cause defense and the good faith and reasonable basis defense, depend, in part, on whether the taxpayer acted in good faith. *See* I.R.C. § 6664(c)(1). Reliance on professional advice provides support for these two defenses, but only if plaintiffs were reasonable in their reliance on the professional advice considering all the circumstances. *See* Treas. Reg. § 1.6664–4(c) (2000). Whether plaintiffs were reasonable in relying on the professional advice turns, in part, on whether plaintiffs had a good faith belief that the proposed tax treatment was legal. *See id.* § 1.6664–4(c)(ii). If the taxpayer believed that the tax treatment was illegal, if the proposed plan was "too good to be true," *id.*

---

9. The court is not referring to the hearsay exception found at Federal Rule of Evidence 803(5) which would allow the record itself to be read into evidence and which would require authentication of the document. *Compare* Fed.R.Evid. 612 (present recollection refreshed), *with* Fed. R.Evid. 803(5) (past recollection recorded). The rules for present recollection refreshed allow witnesses to read or otherwise familiarize themselves with documents that are not admissible as evidence. *See United States v. Rappy*, 157 F.2d 964, 967–68 (2d Cir.1946); Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 6:93 (3d ed.2009). When a document is used to refresh the recollection of a witness, the document itself is not offered into evidence and need not be admissible as evidence. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 93 n. 17 (2d Cir.1984). Therefore, the transcripts could be used to refresh the recollection of Chester Decker (Mr. Decker) and Timothy Seaberg (Mr. Seaberg) during a trial, even if the transcripts cannot be authenticated.

§ 1.6662–3(b)(1)(i), or if the tax professional failed to consider all the facts and circumstances, the taxpayer cannot rely on the advice of the tax professional to establish good faith, *id.* § 1.6664–4(c).

Plaintiffs assert that, notwithstanding the hearsay rules, the transcripts should be stricken because the records have not been authenticated. Pls.' Mot. Strike 6–10. Plaintiffs are conflating two different inquiries: whether evidence may be relied on at summary judgment with whether evidence in a particular form is admissible at trial. Authentication requires that there be "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Plaintiffs assert that the transcripts cannot be authenticated, and that in order for the transcripts to be authenticated, there must be evidence that they are accurate and " 'that the words are accurately reproduced and the voices accurately identified.' " Pls.' Reply Mot. Strike 3 (quoting *United States v. Rochan,* 563 F.2d 1246, 1251 (5th Cir.1977)). Plaintiffs assert that, even though Mr. Decker testified that the transcript "correlates with his memory of the conversation," and that the transcript "relates to the conversation" that he had with plaintiffs, the transcript cannot be authenticated. *Id.*

At the summary judgment stage, the underlying information, rather than the form of the information, must be admissible. See *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; see also RCFC 56 (allowing either party to move for summary judgment "with or without supporting affidavits"). The information in the depositions is sufficient to support the finding that the speakers in these transcripts could testify to the topics of conversation that were held, and to the persons present during the conversations. See, e.g., Def.'s Resp. Mot. Strike Exh. 1 (Decker Dep.), APP–A–11 to –12, 28:23–29:1 ("Q. Okay. And after reviewing [the transcript], does it correlate with your—or does it—with your memory of the conversation that you [had] with the Sands?" "A. It does."). Mr. Decker also stated in his deposition that the transcript at issue captured the "gist" of the conversation between himself and Richard Sands. *Id.* at APP–A–13, 46:19–20.

In his deposition, Mr. Seaberg stated that there is no reason to doubt that he told plaintiffs that they would be able to eliminate capital gains taxes. Def.'s Resp. Mot. Strike Exh. 2 (Seaberg Dep.), APP–A–18, 16:4–6 ("[The conversation] was basically we have a way to eliminate or reduce your capital gain taxes."), APP–A–21, 32:12–16 ("Q: Okay. When [the transcript] says we can eliminate the capital gains taxes on that, any reason to believe that's not what you told Mr. Sands? A: Unless it was altered, no. I don't have any knowledge that it was being altered."). Further, after listening to the tapes from which the transcripts were made, Mr. Seaberg stated that he recognized his own voice as the voice on the tape. *Id.* at APP–A–25, 104:23–25. Mr. Seaberg stated that he could not confirm the transcript is completely accurate, but that the transcription is "correct up to about 90 percent. There [were] a couple of things I wasn't 100 percent sure [about]. I'd say 90 percent." Pls.' Mot. Strike Exh. 3 (Seaberg Dep.), at 128:7–9. When asked a second time, Mr. Seaberg stated that the transcript was "like 90, maybe 95 percent" correct. *Id.* at 135:8. Defendant has adequately supported its contention that the transcripts are substantially authentic records of statements by Heritage employees to plaintiffs and may therefore be relied on by the court at the summary judgment stage. The court will review the particulars and the "gist" of the transcript information in Parts E and F below.

### D. Discovery Sanction

Plaintiffs assert, as an alternative argument, that because defendant "unreasonably delayed informing plaintiffs of the transcripts and producing them to plaintiffs," the transcripts should be excluded as a discovery sanction. Pls.' Mot. Strike 16. RCFC 37(c) states:

If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless. In addition to or instead of this sanction, the court ... may impose other appropriate sanctions....
RCFC 37(c)(1).

■ Although the IRS had possession of documents pertaining to the Sands, defendant's counsel was not provided with the documents until July 24, 2007. Def.'s Resp. Mot. Strike 19. There was a significant delay in transferring the relevant documents from the IRS to defendant's counsel because the documents were required to be reviewed and segregated before being turned over to defendant's counsel in order to prevent disclosure of privileged information. Def.'s Resp. Mot. Strike 18–19. There were also delays resulting from internal issues regarding the funding for copying and segregating the documents. Pls.' Mot. Strike 16–17; Def.'s Resp. Mot. Strike 21–22. "On July 24, 2007, the IRS completed its review and segregation of the Sands[-]related documents from the other documents provided by the Heritage Trustee, and it forwarded the Sands[-]related material to [defendant's counsel of record]." Def.'s Resp. Mot. Strike 19. Defendant's counsel did not receive the transcripts until July 24, 2007 and turned over the transcripts to plaintiffs on July 31, 2007. Id. Although discovery was scheduled to end on July 31, 2007, the court extended discovery to give the parties time to address issues presented in the transcripts. Id. at 19–20; see Pls.' Mot. Strike 3. These facts do not support a finding that defendant failed to provide information as required by RCFC 26. In the court's view, sanctions are not appropriate.

### E. Transcript Assertions

Mr. Decker contacted Richard Sands in early May, 2001. Pls.' Resp. Second Facts 8. In his deposition, Mr. Decker identified the initials "CRD" as signifying those portions of the transcript when he is speaking, Pls.' Mot. Strike, Exh. 2 (Decker Dep.), at 24:3–5, and the initials "PC" as signifying those portions of the transcript when a prospective client is speaking, id. at 25:13–15. After reading over the transcript, submitted as defendant's Exhibit 27, Mr. Decker confirmed that the transcript of the conversation between himself and Richard Sands "covers the gist of the conversation." Id. at 40:20–25, 46:19–20.

Mr. Seaberg met with plaintiffs in May and June, 2001. See Pls.' Resp. Third Facts 10. In his deposition, Mr. Seaberg testified that, although he could not tell the difference between Richard Sands and Robert Sands when he listened to the tape, he thought that "RS" stood for Robert Sands, Pls.' Mot. Strike, Exh. 2 (Seaberg Dep.), 109:2–15, and that "PC" stood for potential client, Def.'s Resp. Mot. Strike Exh. 2 (Seaberg Dep.), APP–A–20, 28:22–29:6. Mr. Seaberg also identified the voice labeled as "TWS" to be himself, id. at APP–A–21, 32:9–11, and identified himself as the speaker in the recording, id. at APP–A–25, 104:23–25. While listening to the recording, Mr. Seaberg testified further that "a couple of words ... were missing, but they weren't really material." Pls.' Mot. Strike, Exh. 3 (Seaberg Dep.), 114:11–13. Plaintiffs agree that Richard and Robert Sands met with Heritage personnel on or about May 31, June 13 and June 27, 2001, Pls.' Resp. Second Facts 9, but in their depositions, Richard and Robert Sands each stated several times that they could not recall anything from the conversations they had with Heritage employees, e.g., Pls.' Mot. Strike, Exh. 5 (Robert Sands Dep.), 35:3–18; Def.'s Resp. Mot. Strike Exh. 5 (Richard Sands Dep.), APP–A–42, 33:7–34:2.

#### 1. Conversation with Chester Decker

Mr. Decker (CRD) met with Richard Sands (RS) in the middle of May 2001 and told Richard that Heritage's transactions would eliminate capitals gains taxes. Def.'s Resp. App'x B, Exh. 26, APP–B–1 to –2 ("RS: Okay. And are we eliminating the capital gain tax entirely? CRD: Entirely. RS: Zero. CRD: Zero."), APP–B–3 ("RS: And you have not run into a situation that you couldn't eliminate the capital gains tax on it. CRD: Only, the only time we cannot eliminate the capital gains is if you already paid the tax. If the capital gain is in this calendar year, we can still help you."), APP–B–9 ("CRD: Right. And, um, you know, with, with all the ways, different ways that we're taxe[d] to Sunday, you know, a lot of people don't mind, uh, bein' able to eliminate

capital gains taxes."); APP–B–13 ("CRD: [W]e do eliminate down to zero. I can tell you that, um, hands down.").

Mr. Decker assured Richard Sands that Heritage charged only a contingent fee and would be paid only as a percentage of tax savings. Def.'s App'x B, APP–B–3 ("CRD: Now, if you do decide to go with our services, we're so confident in the abilities of our strategies that we are paid, uh, on a contingency fee basis. Basically, we make a percentage of the tax dollars you would have paid."), APP–B–4 ("RS: What do you charge as a percent of the tax? CRD: Uh, it, actually it's about 25% of what you would have paid or roughly about 5% of, of what, uh, that the gain is."), APP–B–10 ("RS: Yeah. With regards to estate taxes, how do you bill for that? CRD: Same, same exact way.... We eliminate the tax and then, uh, we take 7 1/4. RS: 25%. CRD: Of, of what it would have been.").

Mr. Decker confirmed the substance of his statements during his deposition: that the transaction marketed by Heritage would completely eliminate plaintiffs' capital gains taxes. Def.'s Resp. Mot. Strike App'x A, Exh. 1 (Decker Dep.), APP–A–2, 8:22–24 ("Q: Okay. Were you discussing the elimination of capital gains tax with [plaintiffs]? A: Yes."). Mr. Decker also confirmed that the transcript correlated with his memory of his conversation with plaintiffs. *Id.* at APP–A–11 to –12, 28:23–29:11 ("Q: Okay. And after reviewing it, does it correlate with your—or does it—with your memory of the conversation that you [had] with the Sands? A: It does. Q: But I just want to make sure, as far as your memory goes, that it's—relates to the conversation you had with the Sands that was a part of this—made part of this transcript. A: Yes."), APP–A–13, 46:12–20 ("Q: And while maybe they—you've testified they may not be word-for-word, but is the gist of the conversation, the substance of the conversation that's shown and set out in this transcript that's [defendant's Exhibit 26], is there any reason that you would doubt that the substance of the conversation occurred as it did, based on this transcript? A: No. It does capture the gist of the conversation....").

### 2. Conversations with Tim Seaberg

Plaintiffs also met with Mr. Seaberg to discuss the Heritage transactions and, during these conversations, Mr. Seaberg assured plaintiffs several times that the transactions would eliminate the capital gains taxes they would otherwise be required to pay. E.g., Def.'s Resp. App'x B, Exh. 27, APP–B–21 ("[W]e can eliminate the capital gains taxes on that."). Plaintiffs met with Mr. Seaberg on at least three different occasions. See *id.* at Exh. 27, APP–B–14; Def.'s Resp. App'x B, Exh. 28, APP–B–48; Def.'s Resp. App'x B, Exh. 29, APP–B–100; see also Pls.' Resp. Second Facts 9 (stating that plaintiffs met with employees of Heritage on at least three separate occasions). When plaintiffs expressed concern about defense costs, Mr. Seaberg assured plaintiffs that Heritage would arrange for an opinion letter from a top law firm that would shield plaintiffs from liability. Def.'s Resp. App'x B, Exh. 27, APP–B–25 ("RS: ... other firms such as yourself there are some law firms that are selling similar type arrangements are paying defense costs. TWS: Yeah. RS: Deals that we've done we usually get defense costs through the appeal level."), APP–B–26 ("TWS: No, no here's what the risks are you're going to get an opinion letter from a Top 200 law firm. PC: Mm-hmm. TWS: Ok that's going to release you from penalties.... PC: What level of opinion will we get? TWS: More likely than not."), APP–B–32 ("TWS: Right the minimum here's what the deal with the minimums is um there's a minimum for an individual because he's going to have to get an opinion letter. Opinion letter is going to cost maybe $100,000 to 150,000....."). The second meeting included, in addition to Mr. Seaberg, Mr. Kournman, one of the principals of Heritage, see Pls.' Resp. Second Facts 9, 11, 12, who also assured plaintiffs that they would be protected from certain penalties because they would have an opinion letter from a top law firm, Def.'s Resp. App'x B, Exh. 28, APP–13–67 ("I mean first of all they can't charge you with fraud because you're going to have an opinion from one of the top 200 law firms in the United States. Who say it's more likely

than not that you are taking the correct action.").

Mr. Seaberg also reassured plaintiffs that Heritage's fee was based on the percentage of taxes saved and that if plaintiffs were audited and the transaction did not work, Heritage would not be paid. *Id.* at Exh. 27, APP–13–24 to –25 ("TWS: So the general deal is what everyone does is a 25/75 split we get 25% of the tax savings you get 75%. Ok that's the general deal now if you look at the whole thing and you're uneasy you think yeah it works but I want a guarantee. We'll do a 50/50 deal where we'll put all of it in escrow—all the money that would have been paid in taxes we'll put it in escrow leave it in there for three years let it draw interest. At the end of the three years at the end of the statute [of limitations] period if they haven't come back and said you guys gotta pay these taxes or we're gonna look at this. We split whatever's [in] there 50/50 so I mean you know it's taking virtually all the risk out [o]f it. PC: Well, let's say they do come back. TWS: Mm-hmm. PC: Ok, the taxes are paid out of that account. TWS: Then we don't get anything."), APP–13–25 to –26 ("PC: Go back to this standard deal 25/75. TWS: Ok. PC: Do you get your 25% back if it's audited? TWS: No, no here's what the risks are you're going to get an opinion letter from a Top 200 law firm. PC: Mm-hmm. TWS: Ok that's going to release you from penalties."), APP–13–29 ("TWS: Yeah, you don't actually—actually you'll know what your benefit is going to be but you don't pay us until you actually sell it.").

During Mr. Seaberg's deposition, he stated that there was no reason to doubt that he told plaintiffs that Heritage could eliminate their capital gains taxes. Def.'s Resp. Mot. Strike App'x A, Exh. 2 (Seaberg Dep.), APP–A–21, 32:12–16 ("Q: Okay. When it says, We can eliminate the capital gains taxes on that, any reason to believe that's not what you told Mr. Sands? A: Unless it was altered, no. I don't have any knowledge that it was being altered."). Further, Mr. Seaberg confirmed that there was no reason to doubt that the transcript was in fact the transcript of his meeting with Richard Sands. *Id.*, APP–A20, 28:17–21 ("Q: Okay. I hate to hit you cold on this thing, but if you'd take a look at this and tell me if there's any reason why you would think this is not a transcription of the meeting that you had on May 31 st with Richard Sands? A: It seems like—I don't see any reason so far.").

### F. The "Gist" of the Transcript Information

The court views the gist of the information to be: plaintiffs met with employees from Heritage to discuss possible transactions, the purpose of which was described as the elimination of capital gains taxes; that Heritage assured plaintiffs that it would deliver an opinion letter from a top law firm for the purpose of protecting plaintiffs from penalties if plaintiffs were audited; and that Heritage was to be paid for its performance based on a percentage of the taxes plaintiffs saved. The court will not consider the transcripts for the truth of the matters asserted—whether the Heritage strategies could actually eliminate income taxes and whether the opinion letters could actually protect plaintiffs from penalties—but whether plaintiffs acted with reasonable cause and good faith in employing those strategies. In addressing whether plaintiffs acted with reasonable cause and good faith, *see infra* Parts IV.A.3, B.4, the court will determine whether, considering all the circumstances, plaintiffs' reliance on the Lewis Rice opinion letters was reasonable.

### III. Legal Standards

#### A. Jurisdiction

██ This court has jurisdiction to hear partnership tax readjustment petitions under 26 U.S.C. § 6226(e)(1) if a partner first files a petition deposit in the amount "by which the tax liability of the partner would be increased if the treatment of partnership items on the partner's return were made consistent with the treatment of partnership items on the partnership return, as adjusted by the [FPAA]." 26 U.S.C. § 6226(e)(1) (2000). The court has jurisdiction to review an FPAA

> to determine all partnership items of the partnership for the partnership taxable year to which the notice of [FPAA] related,

the proper allocation of such items among the partners, the applicability of *any penalty*, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f) (emphasis added). Defenses that are personal to the partner or are dependent upon the partner's separate return are not properly determined at the partnership level. Treas. Reg. § 301.622–1(d). The court will therefore limit its consideration to the applicability of penalties and defenses as they relate to the partnership and will not consider any penalties or defenses that are unique to any of the partners individually. The amount of any applicable penalties that are payable by an individual partner must be resolved at the partner level, but the underlying determination that an accuracy-related penalty is proper under § 6662 must be made in a partnership-level proceeding.[10] *Clearmeadow Invs., LLC v. United States (Clearmeadow)*, 87 Fed.Cl. 509, 531, (2009); *see Jade Trading, LLC ex rel Ervin v. United States (Jade Trading II)*, 598 F.3d 1372, 1379–80 (Fed.Cir.2010) (finding that penalties that do not rely on affected items are appropriate for a partnership-level determination). The court therefore has jurisdiction to determine whether any accuracy-related penalties or defenses are applicable to the partnership.

The partners that form a partnership, rather than the partnership itself, are liable for taxes. I.R.C. § 701. However, a partnership is required to file an information return every year with the IRS to report items of gross income and allowable deductions. *See* I.R.C. § 6031(a). A partnership item is defined as "any item required to be taken into account for the partnership's taxable year ... to the extent ... such item is more appropriately determined at the partnership level than at the partner level." I.R.C. § 6231(a)(3). Items that are appropriately determined at the partnership level include "items of income, gain, loss, deduction, or credit of the partnership," "[p]artnership liabilities" and "[d]istributions from partnerships." Treas. Reg. § 301.6231(a)(3)–1 (a)(1)(i), (1)(v), (4)(ii). Partnership items also include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." *Id.* § 301.6231(a)(3)–1(b).

 Generally, the assessment of penalties related to partnership items is properly determined at the partnership level. Temp. Treas. Reg. § 301.6221–1T(c) (1999).[11] "Partner level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership level proceeding, but may be asserted through separate refund actions following assessment and payment." *Id.* § 301.6221–1T(d). Partner-level defenses are defenses that "are personal to the partner or are dependent upon the partner's separate return" and include

---

**10.** In *Jade Trading, LLC ex rel. Ervin v. United States (Jade Trading II)*, 598 F.3d 1372, 1380 (Fed.Cir.2010), the Court of Appeals for the Federal Circuit (Federal Circuit) determined that the Court of Federal Claims did not have jurisdiction to determine the applicability of penalties in a tax refund case. This determination was based on the finding that outside basis was an affected item. *Id.*

In this case, the questions before the court are " 'limited to defenses based solely on plaintiffs' § 465 concession' " which do not require the computation of basis. *See* Plaintiffs' Motion for Partial Summary Judgment Regarding the Applicability of the Negligence and Substantial Understatement Penalties (Pls.' Mot.), Dkt. 181, 1 (quoting Opinion of August 26, 2009, Dkt. No. 173). The limited scope of the court's inquiry therefore distinguishes this case from *Jade Trading II*.

**11.** Treasury Regulation § 301.6221–1 became effective for taxable years beginning on or after October 4, 2001. Treas. Reg. § 301.6221–1(f). Prior to that, Temporary Treasury Regulation § 301.6221–1T (1999) was in effect and was applicable to plaintiffs' returns for the years in question, 2001 and 2002. Temp. Treas. Reg. § 301.6221–1T (1999). All relevant portions of the prior and successor regulations are substantially the same. *Compare* Temp. Treas. Reg. § 301.6221–1T(c)–(d) (1999), *with* Treas. Reg. § 301.6221–1(c)–(d) (2001). The tax returns at issue span two tax years—the tax year ending December 31, 2001 and the tax year ending December 31, 2002. For the tax year ending December 31, 2001, Temporary Treasury Regulation § 301.6221–1T (1999) governs, and for tax year ending December 31, 2002, Treasury Regulation § 301.62221–1 (2001) governs. The two regulations are substantially the same, and any changes do not affect this case.

"whether the partner has met the criteria of ... section 6664(c)(1) (reasonable cause exception)." *Id.* When the reasonable cause and good faith defense is offered as a defense by the partnership, however, the court must consider the reasonable cause and good faith defense at the partnership-level proceeding. *See, e.g., Stobie Creek Invs., LLC v. United States (Stobie Creek),* 82 Fed.Cl. 636, 703 (2008) (citing *Klamath Strategic Inv. Fund, LLC v. United States (Klamath),* 472 F.Supp.2d 885, 902–04 (E.D.Tex.2007) (considering reasonable cause and good faith at the partnership level)); *see also Jade Trading II,* 598 F.3d at 1380 (finding that penalties that do not rely on affected items are appropriate for a partnership-level determination). Plaintiffs have affirmatively raised the reasonable cause and good faith defense, *see* Pls.' Mot. 10–18, and therefore the court has jurisdiction to consider this issue in a partnership-level proceeding.

At the conclusion of the partnership-level proceeding, the IRS will assess individual partners with respect to any tax attributable to their distributive shares of the adjusted partnership items. I.R.C. § 6225(a)(2); *see Bush v. United States,* 599 F.3d 1352, 1355 (Fed.Cir.2010) ("after conclusion of the [partnership-level] proceeding[ ], the IRS can then assess individual partners with respect to the tax attributable to their distributive shares of the adjusted partnership items"). Any partner who has a defense that is "personal to the partner" may raise this defense following the partner-level assessment. *See* Temp. Treas. Reg. § 301.6221–1T(d). In the case before the court, the court will consider the actions of the partnership as a whole—through the actions of its partners—to determine the applicability of penalties and defenses to the partnership.

### B. Cross Motions for Summary Judgment

Under RCFC summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [12] RCFC 56(c)(1); *see Anderson v. Liberty Lobby, Inc. (Anderson),* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (reviewing FRCP 56); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1302 (Fed.Cir.2005). A fact is material if it might significantly affect the outcome of the litigation. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (reviewing FRCP 56). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita),* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that there is no genuine issue "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

> In considering such a motion, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted....

RCFC 56(c)(1). A party defending against a motion for summary judgment must therefore adduce facts to show a material dispute of fact. *See id.* Failure by an opposing party to raise a genuine issue of material fact may result in the court's granting summary judgment in favor of the moving party. *See id.* When a motion for summary judgment is

---

**12.** The RCFC were recently amended; the amended RCFC became effective on January 11, 2010. No changes to the RCFC affect the analysis or outcome of the matters addressed in this Opinion and Order.

The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). RCFC 56 2002 rules committee notes ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); *see Flowers v. United States,* 75 Fed.Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."); *Champagne v. United States,* 35 Fed.Cl. 198, 205 n. 5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP]. Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); *see also C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541 n. 2 (Fed.Cir.1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

made and supported as provided in RCFC 56(e), an adverse party may not rest upon the mere allegations or denials of its own pleading. RCFC 56(e). The adverse party's response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. *Id.* If the adverse party does not so respond, summary judgment may be entered against the adverse party. *Id.*

Under RCFC 56, the court must draw all inferences from the facts before it in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Mann v. United States,* 334 F.3d 1048, 1050 (Fed.Cir.2003) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir. 1984)). To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. However, the non-movant must establish the existence of a fact that supports a material element on which the party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the court must evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the nonmoving party." *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir.1998).

### C. Accuracy–Related Penalties

There are six accuracy-related penalties in § 6662: negligence, substantial understatement of income tax, substantial valuation misstatement, substantial overstatement of pension liabilities, substantial understatement of estate or gift tax, and undisclosed foreign financial asset undervaluation. I.R.C. § 6662(b). The government asserts that of these, the penalties for negligence and for substantial understatement of income tax apply. Def.'s Mot. 2. Section 6662 of the I.R.C. imposes a twenty-percent accuracy-related penalty on any portion of the underpayment attributable to negligence (negligence penalty). I.R.C. § 6662(a), (b)(1). Section 6662 of the I.R.C. also imposes a twenty-percent accuracy-related penalty on any portion of an underpayment that is attributable to the substantial understatement of income tax (substantial understatement penalty). *Id.* § 6662(a), (b)(2). Accuracy-related penalties are not cumulative; therefore, the maximum accuracy-related penalty imposed on any portion of the understatement is 20% and the different penalties are pleaded in the alternative. Treas. Reg. § 1.6662–2(c).

There is an absolute defense to either of these penalties if the taxpayer shows "that there was a reasonable cause for such portion [of the understatement] and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1). Additionally, the amount of the substantial understatement penalty is reduced for any portion of the understatement as to which the taxpayer can establish substantial authority for the position that the taxpayer took. *Id.* § 6662(d)(2)(B)(i). If the substantial understatement was the result of a tax shelter, the taxpayer may reduce the amount owed by establishing that substantial authority exists for the position taken and that the taxpayer reasonably believed that the reported treatment of an item was more likely than not the proper treatment. Treas. Reg. § 1.6662–4(g)(1); *see also* I.R.C. § 6662(d)(2)(C)(i)

(making the substantial authority defense unavailable when the taxpayer has engaged in a tax shelter). Plaintiffs assert that the negligence and substantial understatement penalties are inapplicable because plaintiffs had substantial authority for the positions taken on their returns and because plaintiffs acted reasonably and in good faith. Pls.' Mot. 1.[13]

### 1. Negligence Penalty

The negligence penalty applies to the extent that an understatement of the tax was attributable to the taxpayer's negligence. I.R.C. § 6662(b)(1). The taxpayer is required to pay 20% of the underpayment as a penalty with respect to any portion of the underpayment which is attributable to "[n]egligence or disregard of rules or regulations." *Id.* § 6662(a), (b)(1); *see* Treas. Reg. § 1.6662–3(a).

"For purposes of this section, the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard" of the tax laws. I.R.C. § 6662(c). Negligence includes the "failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662–3(b)(1). "Negligence is strongly indicated where … [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." *Id.* § 1.6662–3(b)(1)(ii). Disregard for the "rules or regulations is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation." *Id.* § 1.6662–3(b)(2). A taxpayer's "disregard is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation

from the standard of conduct that a reasonable person would observe." *Id.*

The United States Court of Appeals for the Fifth Circuit defines negligence as the "failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Marcello v. Comm'r*, 380 F.2d 499, 506 (5th Cir.1967). The United State Court of Appeals for the Third Circuit has found that when "a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds as his own peril." *Neonatology Assocs., P.A. v. Comm'r (Neonatology)*, 299 F.3d 221, 234 (3d Cir. 2002); *see* Treas. Reg. § 1.6662–3(b)(1)(ii).

A taxpayer is not negligent where there is a reasonable basis for the position taken. Treas. Reg. § 1.6662–3(b)(1). "Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." *Id.* § 1.6662–3(b)(3). It follows then that "[i]f a return position is reasonably based on one or more of the authorities set forth in [the substantial authority section] … the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2)." *Id.* § 1.6662–3(b)(3). The reasonable basis standard is less stringent than the substantial authority standard; if the substantial authority defense is applicable to the substantial understatement penalty, the reasonable cause defense will also be applicable. *See id.* § 1.6662–4(d)(2).

Further, a taxpayer that would otherwise be subject to a 20% accuracy-related penalty under § 6662(b)(1) for negligence or disregard of rules or regulations may not be liable if the taxpayer can demonstrate that the stated deduction was the result of reasonable cause and good faith. I.R.C. § 6664(c)(1); Treas. Reg. § 1.6664–4(a). "No penalty shall be imposed under section 6662[ (b)(1) ]

---

**13.** Plaintiffs have not argued the defense of adequate disclosure and reasonable basis. *See* I.R.C. § 6662(d)(2)(B)(ii); Pls.' Mot. *passim;* Plaintiffs' Reply in Support of Plaintiffs' Motion for Partial Summary Judgment on Penalties (Pls.' Reply), Dkt. No. 190, *passim.* Accordingly, the court will not address that defense.

... with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1); Treas. Reg. § 1.6664–4(a). The good faith defense to the negligence penalty is discussed in greater detail below. *See infra* Part III.C.5.

### 2. Substantial Understatement Penalty

Section 6662(b) imposes a 20% penalty to "[a]ny substantial understatement of income tax." I.R.C. § 6662(a), (b)(2). The term "substantial understatement" is defined by § 6662(d): "there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000." *Id.* § 6662(d)(1)(A). The amount of the substantial understatement used to compute the penalty does not include any item for which there was substantial supporting authority. *Id.* § 6662(d)(2)(B)(i); Treas. Reg. § 16662–4(a). Specifically, § 6662(d)(2)(B) states:

> The amount of the understatement ... shall be reduced by that portion of the understatement which is attributable to—
>
> (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment....

I.R.C. § 6662(d)(2)(B)(i).

### 3. Substantial Authority Defense to the Substantial Underpayment Penalty

■ A taxpayer is not assessed a 20% accuracy penalty for substantial understatement of any item for which there is substantial authority to support the taxpayer's treatment. *Id.* § 6662(d)(2)(B)(i); *see* Treas. Reg. § 1.6662–4(d)(1) ("If there is substantial authority for the tax treatment of an item, the item is treated as if it were shown properly on the return for the taxable year in computing the [penalty]."). The substantial authority standard is an objective standard that requires an "analysis of the law and application of the law to relevant facts." Treas. Reg. § 1.6662–4(d)(2). The substantial authority standard is met only if the "weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary treatment." *Id.* § 1.6662–4(d)(3)(i). The weight given to each authority depends on its relevance, persuasiveness and source. *Id.* § 1.6662–4(d)(3)(ii). "Thus a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision." *Id.* The regulations limit the authorities that may be relied on in deciding whether there is substantial authority for the tax treatment of an item:

> Applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 ...; Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or *opinions rendered by tax professionals are not authority.*

*Id.* § 1.6662–4(d)(3)(iii) (emphasis added). Taxpayers have substantial authority only for positions that are supported by well-reasoned opinions in the listed sources. *See id.* § 1.6662–4(d)(3)(ii). The opinion of a tax professional may be based on substantial authority but is not itself substantial authority such that the taxpayer may rely on the advice of a tax professional to reduce the penalty for a substantial understatement. *See id.* § 1.6662–4(d)(3)(iii).

#### 4. Tax Shelter Items

■ The substantial authority defense does not apply to any substantial understatement that is attributable to a tax shelter. I.R.C. § 6662(d)(2)(C)(i). A partnership is engaged in a tax shelter "if a significant purpose of such partnership . . . is the avoidance or evasion of Federal income tax." *Id.* § 6662(d)(2)(C)(ii). "The principal purpose of an entity, plan or arrangement is to avoid or evade Federal income tax if that purpose exceeds any other purpose." Treas. Reg. § 1.6662–4(g)(2)(i). Tax shelters are generally structured with little or no motive for economic gain, but the existence of economic substance does not establish in and of itself that a transaction is not a tax shelter. *Id.*

If an item is determined to be a tax shelter item, it may nevertheless be eligible for a reduction if there is substantial authority for the tax treatment of that item and the taxpayer reasonably believed at the time the return was filed that the tax treatment of the item was more likely than not the proper treatment. *Id.* § 1.6662–4(g)(1). A taxpayer is considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if "[t]he taxpayer analyzes the pertinent facts . . . and in reliance upon that analysis, reasonably concludes in good faith that there is a greater than 50–percent likelihood that the tax treatment will be upheld if challenged by the Internal Revenue Service." *Id.* § 1.6662–4(g)(4)(i)(A).

> [Alternatively,] a taxpayer is considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if . . . [t]he taxpayer reasonably relies in good faith on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of pertinent facts and authorities . . . and unambiguously states that the tax advisor concludes that there is a greater than 50–percent likelihood that the tax treatment of the item will be upheld if challenged by the Internal Revenue Service.

*Id.* § 1.6662–4(g)(4)(i).

#### 5. Reasonable Cause and Good Faith Exception

■ I.R.C. § 6664(c)(1) provides an absolute defense to any accuracy-related penalty to the extent that the taxpayer establishes reasonable cause and good faith for that portion of an underpayment. I.R.C. § 6664(c)(1). A taxpayer that would otherwise be subject to a twenty-percent accuracy-related penalty under § 6662(b) for negligence or for substantial understatement is not liable if the taxpayer can demonstrate that the stated deduction was made for a reasonable cause and in good faith. *Id.;* Treas. Reg. § 1.6664–4(a). "No penalty shall be imposed under section 6662[ (b) ] . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1); *see* Treas. Reg. § 1.6664–4(a). Treasury Regulation § 1.6664–4 sets out rules for determining whether the reasonable cause and good faith exception applies. Treas. Reg. § 1.6664–4. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." *Id.* § 1.6664–4(b)(1). Although each instance requires a case-by-case determination, generally the most important factor in assessing the applicability of the exception is the amount of effort the taxpayer spent to determine the proper tax liability. *Id.*

■ When considering the taxpayer's effort to determine the proper tax liability, the taxpayer's reliance on the advice of a professional tax adviser may not be sufficient to demonstrate reasonable cause and good faith. *Id.* ("Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith."). "Reliance on . . . professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." *Id.* To determine if reliance on a tax professional's advice was reasonable and in good faith, all facts and circumstances must be taken into account. *Id.* § 1.6664–4(c). "For exam-

ple, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." *Id.; see also* Treas. Reg. § 1.6664–4(b)(1) ("Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of ... the experience, knowledge, and education of the taxpayer.").

In order to establish reasonable reliance in good faith on the advice of a tax professional, a taxpayer must establish that "[a]ll facts and circumstances [were] considered," and "[n]o unreasonable assumptions" were made. Treas. Reg. § 1.6664–4(c)(1)(i)–(ii). For the advice to be based on "[a]ll the facts and circumstances," it must include all pertinent facts and circumstances including "the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner." *Id.* § 1.6664–4(c)(1)(i). Additionally, "the advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." *Id.* § 1.6664–4(c)(1)(ii). "The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (*including the opinion of a tax advisor*) in good faith." *Id.* § 1.6664–4(c)(1) (emphasis added).

## IV. Discussion

In their initial returns, plaintiffs took the position that I.R.C. § 465 was inapplicable to them. Pls.' Mot. 5. The government issued FPAAs asserting that § 465 applied and limited plaintiffs' deductions. *Id.* at 5–6. Two years after filing their complaint in this action, plaintiffs conceded liability for underpayment and conceded the government's position with regard to § 465. *Id.* at 6. Because plaintiffs having conceded the tax due and owing, the only remaining issue is whether plaintiffs are liable for an accuracy-related penalty. *Id.* at 1. Plaintiffs' liability depends on whether plaintiffs had substan-

tial authority for their initial position, whether plaintiffs had a reasonable basis for their initial position and whether plaintiffs acted with reasonable cause and good faith. *Id.* at 1, 10. Plaintiffs contend that because they had substantial authority for their initial position and because they acted with reasonable cause and good faith with respect to their initial position, namely, that § 465 was not applicable, they are not liable for any accuracy-related penalties under § 6662. *Id.* at 6, 8, 10. The court now addresses deductions under § 465.

Under the tax code, all income is presumed to be included in the calculation of taxes, *see* I.R.C. § 61(a), but deductions are a matter of legislative grace and require a specific legislative provision, *see Comm'r v. Sullivan*, 356 U.S. 27, 28, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958). The inquiry in this case is limited to § 465 of the tax code. *See Alpha III*, 89 Fed.Cl. at 357. Section 465 is titled "Deductions limited to amount at risk" and, as the title indicates, limits deductions to the amount at risk when the taxpayer is engaged in certain activities. I.R.C. § 465. Subsection (b) clarifies what amounts are considered at risk, *id.* § 465(b), and subsection (c) lists the activities to which § 465 applies, *id.* § 465(c).

Section 465 allows taxpayers engaged in certain types of activities to deduct certain limited amounts. *Id.* § 465. Losses that stem from the specified activities are allowed as deductions only with respect to those amounts as to which the taxpayer is still at risk at the close of the taxable year. *Id.* § 465(a)(1). As to their initial returns, plaintiffs assert that the deduction limits of § 465 did not apply to them because they were not engaged in an activity to which § 465 applies. *See* Pls.' Resp. 9. Plaintiffs have since conceded the government's position regarding § 465 in the FPAAs and agree that § 465 applies. Pls.' Mot. 6. In support of the argument that there was substantial authority for their initial position, plaintiffs asserted that there is substantial authority to support the position that they were at risk for an amount greater than or equal to the losses they claimed. *See* Pls.' Resp. 9. Plaintiffs therefore asserted that there is substantial author-

ity that § 465 would not limit their deductions because the entire amount plaintiffs initially claimed as a deduction would be covered. *Id.* The government asserts, and plaintiffs have since conceded, that § 465 applies to the activities plaintiffs were engaged in and limits the amount that plaintiffs can claim as a deduction. Pls.' Mot. 6; Pls.' Resp. 9.

▮▮▮ Defendant asserts that plaintiffs engaged in a tax shelter, Def.'s Mot. 3, and that plaintiffs are subject to a 20% accuracy-related penalty as a result of negligence and/or as a result of substantial underpayment, *id.* at. 2. Plaintiffs assert that both penalties are inapplicable because plaintiffs had substantial authority for the position taken on their returns and/or because plaintiffs acted reasonably and in good faith in relying on the advice of experienced and competent tax advisers. Pls.' Mot. 1–2. The parties have submitted cross-motions for summary judgment on the issue of penalties, *see* Dkt. Nos. 179, 181, and the court will address each in turn. When considering cross-motions for summary judgment, the court will evaluate each motion on its own merits, viewing the evidence in favor of the nonmoving party. *Bubble Room, Inc.,* 159 F.3d at 561. Defendant has the burden of production with regard to penalties. I.R.C. § 7491(c). Plaintiffs have the burden of proof with regard to defenses. *See Jade Trading, LLC v. United States (Jade Trading I),* 80 Fed.Cl. 11, 57 (2007), *aff'd in relevant part, Jade Trading II,* 598 F.3d 1372 (Fed.Cir.2010).

The court considered above the admissibility of transcripts that purport to record conversations between Richard and Robert Sands and certain employees of Heritage and found the transcripts admissible. *See supra* Part II. The court will now consider plaintiffs' Motion, *see infra* Part IV.A, and defendant's Motion, *see infra* Part IV.B.

In considering plaintiffs' Motion, the court will first consider whether plaintiffs had substantial authority for the position taken on their tax returns. *See infra* Part IV.A.1. Next, the court will consider whether plaintiffs had a reasonable basis for the position taken on their returns. *See infra* Part IV.A.2. Finally, the court will consider whether

plaintiffs had good faith and reasonable cause for the position taken on their returns. *See infra* Part IV.A.3.

After ruling on plaintiffs' Motion, the court will consider defendant's Motion. *See infra* Part IV.B. First, the court will determine whether defendant established that plaintiffs were engaged in a tax shelter. *See infra* Part IV.B.1. Next, the court will consider whether the substantial authority defense is available to plaintiffs. *See infra* Part IV.13.2. The court will the consider whether the negligence penalty is available to plaintiffs, *see infra* Part IV.13.3, and—if it is— whether the reasonable basis defense is available to plaintiffs, *see infra* Part IV.13.3. Finally the court will consider whether the good faith and reasonable cause defense is available to plaintiffs. *See infra* Part IV.13.4. Defendant has the burden of production with respect to all penalties, *see* I.R.C § 7491(c), and, if defendant meets its burden, the burden shifts to plaintiffs to prove that defenses are available, *see Jade Trading I,* 80 Fed.Cl. at 57.

### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs' Motion asserts that neither the substantial understatement penalty nor the negligence penalty should apply. Pls.' Mot. 8. Plaintiffs assert that they had substantial authority to support the position that they took, *id.* at 8–10, that they acted with a reasonable basis, *id.* at 10, and that they acted with reasonable cause and good faith, *id.* at 10–11.

### 1. Substantial Understatement Penalty and Substantial Authority Defense

Plaintiffs assert that the substantial understatement penalty does not apply because plaintiffs did not substantially understate their taxes within the meaning of the Code after applicable defenses are considered. Pls.' Mot. 8. A substantial understatement is the understatement of tax for any taxable year that exceeds the greater of 10 percent of the required tax or $5,000. I.R.C. § 6662(d)(1)(A). Rather than challenge the calculation, plaintiffs rely entirely on the de-

fenses to the substantial understatement penalty: the substantial authority defense, Pls.' Mot. 8–10, 16–17, and the reasonable cause and good faith defense, *id.* at 10–15.

Plaintiffs have conceded that defendant's FPAA adjustments on the basis of § 465 apply to require capital gain adjustments based on the amount at risk. Alpha Amend. Compl. ¶¶ 39, 42; Pls.' Mot. 6. The concession under § 465 resulted in an understatement of tax under the meaning of § 6662. *See* Pls.' Mot. 6 (listing plaintiffs' concessions); Pls.' Resp. Second Facts 38. Defendant has met its burden of production, *see* 26 I.R.C. § 7491(c), and the court finds there was a substantial understatement of tax.

The court next considers whether the amount of plaintiffs' understatement is supported by substantial authority such that the amount to which the penalty applies should be reduced. *See* I.R.C. § 6662(d)(2)(B). In their amended complaint, plaintiffs conceded the government's position regarding § 465: that the at-risk rules apply to disallow losses, thereby requiring the partnerships and their partners to recognize gain on the transactions. Pls.' Mot. 6. Plaintiffs assert that Lewis Rice determined that § 465 did not apply and that plaintiffs relied on this advice in filing their initial returns. *Id.* at 15. Plaintiffs assert that because Lewis Rice determined that § 465 was inapplicable, it is inconsequential that Lewis Rice did not include anything about the applicability of § 465 in the opinion letters. *See id.* at 15–16. Nevertheless, plaintiffs assert that there was substantial authority for their initial tax treatment and that they believed it was more likely than not the proper tax treatment. *Id.* at 16.

██ Plaintiffs assert that "Lewis Rice's determination that Section 465 was inapplicable was objectively reasonable and supported by the types of authorities described in Treas. Reg. § 1.6662–4(d)(3)(iii) that may constitute substantial authority for a position taken on a return." *Id.* In order to establish a defense to an accuracy-related penalty under § 6662, plaintiffs are limited to the sources set forth in Treasury Regulation § 1.6662–4. *See id.* § 1.6662–4(d)(3)(iii) (limiting the sources a court can consider to, inter

alia, I.R.C. provisions, regulations, revenue rulings, tax treaties, court cases, legislative history, private letter rulings, technical advice memoranda, actions of decisions, general counsel memoranda, notice, announcements and other administrative pronouncements published by the IRS in the Internal Revenue Bulletin). Plaintiffs have the burden of establishing that the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. *See id.* § 1.6662–4(d)(3)(i); *Jade Trading I*, 80 Fed.Cl. at 57. It is irrelevant for the purpose of determining whether there was substantial authority that the Lewis Rice opinion did not expressly address this issue: legal opinions do not constitute substantial authority and are not taken into account. *See* I.R.C. § 1.6662–4(d)(3)(iii).

In their Motion plaintiffs rely on the text of § 465 and *Hambrose Leasing 1984–5 Ltd. P'ship v. Comm'r (Hambrose)*, 99 T.C 298, 1992 WL 210580 (1992), to support their position the § 465 is inapplicable to them. Pls.' Mot. 16–17. Plaintiffs also rely on defendant's earlier briefing on the issue in which defendant argued that § 465 was inapplicable to plaintiffs' initial returns. *Id.* at 17. Plaintiffs point to the language of § 465 in support of their position: the text of § 465 refers to individuals and to corporations but not to partnerships. *Id.* at 16. Further, plaintiffs assert that § 465 serves only to limit deductions and does not increase the amount of a capital gain. *Id.* at 16–17. This distinction means that, while § 465 would disallow claimed losses, it would not require plaintiffs to recognize capital gain once losses were eliminated. *Id.* In their Response plaintiffs rely on legislative history to the enactment of § 465, Pls.' Resp. 8–9, and defendant's earlier briefing on the subject, *id.* at 10. Finally, plaintiffs rely on defendant's actions, pointing to defendant's argument that § 465 has no relevance in this case. Pls.' Mot. 17 (citing Defendant's Response to Plaintiffs' Motion For Partial Summary Judgment (Def.'s Part. Mot.), Dkt. No. 115 at 5–6; United States' Motion to Reconsider Opinion Regarding Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 147 at 3–5). Plaintiffs assert

that defendant's change of tactics *"proves that Lewis Rice was reasonable in also concluding that Section 465 did not apply." Id.*

### a. Statutory Analysis

Plaintiffs emphasize that the plain language of § 465 supports the position on their initial return that § 465 is inapplicable. *Id.* at 16–17. The text of § 465(a) begins with the words: "In the case of-(A) an individual, and (B) a C corporation ... *engaged in an activity to which this section applies.* ..." I.R.C. § 465(a)(1) (emphasis added). Plaintiffs assert that the plain language of the statute makes the section applicable only to individuals and C corporations. *See* Pls.' Mot. 16. Although the language of § 465(a) states that it applies to individuals and certain C corporations, subsection (c) indicates that the statute governs "any taxpayers" engaged in a certain class of activities. I.R.C. § 465(c)(1); *see* I.R.C. § 465(a) ("engaged in an activity to which this section applies"). Section 465 provides special rules for partnerships, requiring that "[i]n the case of a partnership, a partner's share of any qualified nonrecourse financing of such partnership shall be determined on the basis of the partner's share of liabilities of such partnership incurred in connection with such financing...." *Id.* § 465(b)(6)(C). There are also special rules for partnerships that hold leased property of a certain type, *id.* § 465(c)(2)(B), and special aggregation rules for partnerships that engage in more than one type of trade or business, *id.* § 465(c)(3)(B).

The activities to which § 465 applies is further defined in § 465(c). *Id.* § 465(c) (listing activities to which the at-risk rules apply). Subsection (c) makes clear that § 465 governs certain activities rather than certain taxpayers. *Id.* § 465(c)(1) ("This section applies to *any taxpayer* engaged in the activit[ies] [listed below]."). The list of activities was later expanded by the addition of subsection (c)(3): "In the case of taxable years beginning after December 31, 1978, this section also applies to each activity—(i) engaged in by the taxpayer in carrying on a trade or business or for the production of income, and (ii) which is not described in [the

above list]." *Id.* § 465(c)(3)(A). Plaintiffs were "carrying on a trade or business or for the production of income," *id.,* and therefore § 465 applies to limit plaintiffs' deduction. Plaintiffs' claim that the language of § 465 provides substantial authority for the position taken on plaintiffs' initial returns that § 465 is inapplicable is unpersuasive.

Plaintiffs assert that there is authority to support the position that Congress intended for the at-risk rules to apply only to partners' shares of partnership losses, and not to the partners' bases in their partnership interests. Pls.' Resp. 9. Plaintiffs assert that therefore even if § 465 is applicable, it would not require plaintiffs to recognize capital gain once the losses were eliminated. *Id.* Plaintiffs assert that the Senate Report regarding § 465 makes clear that Congress did not intend for § 465 to apply to adjustment of basis. *Id.* at 8–9. Plaintiffs quote the following portion of the Senate Report in their Response:

> The at-risk limitation is only intended to limit the extent to which certain losses in connection with the covered activities may be deducted in the year claimed by the taxpayer. The rules of this provision do not apply for other purposes, such as the determination of basis. Thus, a partner's basis in his interest in the partnership will generally be unaffected by this provision of the committee amendment. However, for purposes of determining how much, if any, of his share of a partnership loss a partner may deduct in any year, this provision [controls].

*Id.* (quoting S.Rep. No. 94–938, pt.1, at 48–49 (1976), U.S.Code Cong. & Admin.News 1976, p. 4029).

Plaintiffs engaged in the short sales of Treasury Notes, Def.'s Third Facts ¶ 17; Pls.' Resp. Third Facts 12, an activity which falls into the broad category of activities engaged in "for the production of income" as that term is used in § 465(c)(3). Plaintiffs increased the basis of their stock by the amount of the short sale proceeds without offsetting the basis by the outstanding obligation to cover the short sales. *See* Pls.' Resp. Second Facts 25. Although the Senate Report states that the rules of § 465 do not

apply to the determination of basis, the Senate Report states that § 465 does apply to determine the amount of partnership loss a partner may deduct. *See* S.Rep. No. 938, 2d Sess. at 48. Therefore, the legislative history clarifies that while § 465 applies to limit the amount of partnership loss plaintiffs may deduct, Congress did not intend § 465 to govern a partner's basis in his partnership interest. *See id.* The basis that affects the FPAAs is plaintiffs' basis in their Constellation stock, not their basis in their partnership interests. *See* Pls.' Resp. Second Facts 35. The Senate Report therefore does not provide substantial authority to support plaintiffs' position on their initial returns.

Section 465 limits deduction to those amounts that are at risk. I.R.C. § 465(a). Plaintiffs assert that there is substantial authority for the position taken on their initial returns that § 465 is inapplicable. Pls.' Mt. 10. Plaintiffs contend, in the alternative, that if § 465 applies, there is substantial authority to support the position that § 465 would not limit plaintiffs' deduction because they were at risk for amounts greater than or equal to the losses they claimed.[14] Pls.' Resp. 9–10. In its Reply, the government states, correctly, that § 465 applies to certain "activities" and that loss from those activities will be allowed only to the extent the taxpayer is at risk at the close of the taxable year. Def.'s Reply 5 (quoting I.R.C. § 465(a)(1) ("any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk ... for such activity at the close of the taxable year.")). Defendant also asserts, correctly, that, because plaintiffs had closed out the short sales before the end of the year, they were not at risk at the "close of the taxable year." *Id.* For example, plaintiffs borrowed securities for the first short sale from the U.S. Treasury on August 23, 2001. Pls.' Resp. Third Facts 12. Plaintiffs closed the first short sale on September 6, 2001. *Id.* at 14. Because plaintiffs were no longer at risk at the end of the taxable year, plaintiffs' loss should not have been allowed.

b. Case Law Analysis

In addition to the Senate Report, plaintiffs cite *Hambrose* in their Motion in support of the assertion that § 465 does not apply to defer or disallow losses at the partnership level.[15] Pls.' Mot. 16. The issue in *Hambrose* was whether the partnership was protected against loss under § 465 and, if so, whether this issue was more appropriately raised in partner-level proceedings or partnership-level proceedings. *Hambrose*, 99 T.C. at 305. The Tax Court acknowledged that § 465 applies to the actions of partnerships and concerned itself with whether, under the facts before it, the claimed disallowance under § 465 would be better considered at a partner-level or partnership-level proceeding. *Id.* at 305, 309–10.

The court in *Hambrose* concluded that, based on the facts before it, the limitation of deductions under § 465 was better determined at the partner level. *Id.* at 312. Before reaching this conclusion, the *Hambrose* court noted:

> Matters that would appear to be appropriate for determination *in a partnership level proceeding,* under [§ 465,] include the following:
>
> (1) amounts invested by the partnership in activities subject to the at[-]risk rules;
>
> (2) losses incurred by the partnership in activities subject to the at[-]risk rules; and
>
> (3) partners' share of losses incurred in activities subject to the at[-]risk rules.

*Id.* at 309 (emphasis added). The Tax Court acknowledged, that § 465(a) limits the deductibility of losses by individuals and C corporations, *id.* at 310 (stating that "the at-risk rules of section 465 apply to limit the deductibility of losses only by individuals and cer-

---

**14.** Although this position differs from the position plaintiffs originally argued, it would have resulted in the same tax liability as plaintiffs claimed on their initial returns.

**15.** Although decisions of the Tax Court are not precedential for and are not binding upon the Court of Federal Claims, decisions of the Tax Court are substantial authority under Treasury Regulation § 1.6662–4(d)(3)(iii). Treas. Reg. § 1.6662–4(d)(3)(iii). Accordingly, this court considers Tax Court decisions in determining whether there is substantial authority to support plaintiffs' tax treatment.

tain C corporations"), and it is this observation that plaintiffs rely on, Pls.' Mot. 16. However, in the very next sentence, the Tax Court states that § 465 affects partnerships to the extent that partnership-level determinations influence the application of § 465 because partnerships are "essentially only conduits for reporting information and incur no tax liability." *See Hambrose*, 99 T.C. at 310 ("First, the at-risk rules of section 465 apply to limit the deductibility of losses only by individuals and certain C corporations. Except to the extent that partnership[-]level determinations may influence the ultimate application of that section, it has no impact on partnerships ....") (internal citations omitted). Although the court in *Hambrose* concluded that the § 465 determinations should be made at the partner level in the particular case before it, the Tax Court noted that its determination was "based on the circumstances of this case." *Id.* at 312.

The individuals controlling all of the transactions at issue in these proceedings are closely-related family members. Pls.' Resp. Third Facts 7–8. First, the individuals opened accounts with Paine Webber. *Id.* at 11. Two days later, the individuals borrowed Treasury Notes from Paine Webber. *Id.* at 12. That same day, the individuals sold the securities in a short sale on the open market. *Id.* Based on these facts and circumstances, the court finds that the applicability of § 465 is best determined at the partnership level. The court therefore finds *Hambrose* inapplicable to the circumstances of this case and determines that *Hambrose* fails to provide substantial authority to support plaintiffs' initial position.

In their Response, plaintiffs reference—but do not explain the applicability of—four cases cited in their July 6, 2007 Response to Defendant's Motion for Summary Judgment and Cross–Motion for Summary Judgment, Dkt. No. 35. Pls.' Resp. 10. Plaintiffs cite *Deputy v. du Pont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940), *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), *Long v. Commissioner*, 71 T.C. 1, 1978 WL 3318 (1978) and *LaRue v. Commissioner*, 90 T.C. 465, 1988 WL 23562 (1988) for the proposition that plaintiffs were at risk for the obligation of the short sales. Pls.' Resp. 9–10.

These cases addresses the application of I.R.C. § 752 and § 23, but make no mention of § 465. *See Deputy v. du Pont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *LaRue v. Comm'r*, 90 T.C. 465, 1988 WL 23562 (1988); *Long v. Comm'r*, 71 T.C. 1, 1978 WL 3318 (1978); *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975). Because none of these cases reference § 465 or otherwise provides guidance regarding the applicability of § 465 to plaintiffs, and because plaintiffs' concession served to limit the court's inquiry to § 465, these cases do not provide authority within the meaning of substantial authority in Treasury Regulation § 1.6664–2. *See* Treas. Reg. § 1.6664–2.

c. Authority Outside the Scope of Treasury Regulation § 1.6662–4

Treasury Regulation § 1.6662–4 limits the types of authority a taxpayer may rely on to establish that there was substantial authority for the taxpayer's initial position. Treas. Reg. § 1.6662–4(d)(3)(iii). Legal opinions prepared by tax advisers are not included in this list and therefore are not considered in determining whether a taxpayer had substantial authority. *Id.* Arguments advanced by the opposing party are also not included and therefore not considered in determining whether a taxpayer had substantial authority. *See id.* The parties have raised several arguments in support of their respective positions that are outside the scope of the substantial authority defense.

Plaintiffs assert that they "did not place any limitations on what Lewis Rice could consider in issuing opinions regarding the proper tax treatment of the transactions; rather, the Sands engaged Lewis Rice to consider *all* relevant tax principles and to advise them on the proper tax reporting of these transactions." Pls.' Mot. 3. Plaintiffs contend that because Lewis Rice was not limited in the scope of its consideration of tax principles, the lack of any discussion by Lewis Rice of § 465, demonstrated that Lewis Rice determined that § 465 was inapplicable to plaintiffs. *See id.* at 5. However, even if Lewis Rice had explicitly determined that, based on plaintiffs' circumstances, § 465 was inapplicable during a partnership-level pro-

ceeding, that explicit determination would be irrelevant. The Lewis Rice opinion is irrelevant for purposes of determining whether there was substantial authority for plaintiffs' position because opinions of tax professionals do not constitute substantial authority. *See* Treas. Reg. § 1.6664–2(d)(3)(iii).

Plaintiffs further assert that defendant, in an earlier motion, argued that adjustment on the basis of § 465 was incorrect. Pls.' Mot. 10 (citing United States' Response to Plaintiffs' Motion for Partial Summary Judgment (defendant's Response to Partial Motion or Def.'s Resp. Part. Mot.), Dkt. No. 115). Plaintiffs interpret defendant's prior statement, that the § 465 adjustment was incorrect, as conclusive evidence that there is substantial authority for plaintiffs' initial position: that § 465 had no impact on plaintiffs' tax returns. *See id.* In its Response to Partial Motion, defendant stated that:

> In the present case, the IRS included the § 465 argument in the FPAA in case there were any partnership level determinations that must be made in order to determine the ultimate computation of the partners' amount at risk in any partner[-]level proceeding.

Def.'s Resp. Part. Mot. 7. In this stage of the proceedings, the government had taken the position that the § 465 determination was meant to operate solely in a partner-level proceeding. Since plaintiffs' concession on the grounds of § 465, the government has changed its strategy in this case. Plaintiffs point to the government's assertion, Pls.' Resp. 18, that "the § 465 adjustment does not speak to partners' basis in assets of the partnerships or to how their partnership gain or loss should be allocated," Def.'s Resp. Part. Mot. 6. Plaintiffs contend that this is the same distinction articulated in the Senate Report: § 465 limits the permissible deduction for at-risk items—it does not affect the determination of basis. Pls.' Resp. 8–9; *see* S.Rep. No. 94–938, at 48–49. Because prior arguments of an opposing party are not one of the enumerated types of authority the court can consider in determining whether substantial authority existed for plaintiffs' position, *see* Treas. Reg. § 1.6662–4(d)(3)(iii), the earlier arguments of defendant are therefore irrelevant to the determination of whether plaintiffs had substantial authority for their initial position.

Defendant asserts that because plaintiffs conceded that § 465 supported the capital gain adjustment, they are now estopped from arguing that there is substantial authority to support their initial position. Def.'s Reply 6. The substantial authority defense is a measure, not of what plaintiffs have argued or what plaintiffs may have believed, but of whether the weight of the authorities supporting plaintiffs' initial treatment is substantial in relation to the weight of authority supporting contrary treatment. *See* Treas. Reg. § 1.6662–4(d)(3)(i). Earlier arguments of either party are not authorities the court may consider in determining whether plaintiffs have met their burden and established substantial authority. *See id.* § 1.6662–4(d)(3)(iii).

d. Conclusion

Viewing the evidence in the light most favorable to the government as the nonmoving party, *see* RCFC 56(c), the court finds that the government has met its burden of production, but that plaintiffs have not met their burden and have failed to establish that there was substantial authority for the position taken. Because the court finds that plaintiffs have not pointed to any authority supporting their initial position, the court need not weigh plaintiffs' arguments against authorities supporting a contrary position. The court finds that substantial authority does not support the tax treatment claimed by plaintiffs in their returns, and therefore the court need not address whether plaintiffs reasonably believed that the tax treatment claimed was more likely than not the proper treatment. To the extent that the substantial understatement penalty is to be calculated at subsequent partner-level proceedings, the taxpayers are not entitled to a reduction for any portion of the understatement on the grounds that such portion is attributable to substantial authority. Whether the reasonable cause and good faith exception apply to defeat the substantial understatement penalty is addressed below. *See infra* Part IV. A.3.

For the foregoing reasons, plaintiffs' Motion regarding the availability to plaintiffs of the substantial authority defense is DENIED.

### 2. Negligence Penalty and the Reasonable Basis Defense

Section 6662(b)(1) imposes a 20% penalty to any portion of an underpayment that is attributable to "negligence or disregard of rules or regulations." I.R.C. § 6662(a), (b)(1). Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of this title" and disregard is defined as "any careless, reckless, or intentional disregard." *Id.* § 6662(c). To determine whether plaintiffs have established a defense to the accuracy-related penalties of § 6662, the court determines whether plaintiffs have a reasonable basis for the position taken in their tax returns. If plaintiffs have a reasonable basis for their actions, they will not be liable for the 20% negligence penalty.[16] Treas. Reg. § 1.6662–3(a), (b)(3).

Negligence includes "any failure to ... exercise ordinary and reasonable care in the preparation of a tax return ... [and] is strongly indicated where ... [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." *Stobie Creek,* 82 Fed.Cl. at 708 (quoting Treas. Reg. § 1.6662–3(b)). If a taxpayer has a reasonable basis for a position taken on a tax return, the taxpayer will not be liable for the 20% negligence penalty. Treas. Reg. § 1.6662–3(a), (b)(3). The standard for establishing reasonable basis is "significantly higher than not frivolous or not patently improper." *Id.* § 1.6662–3(b)(3). Plaintiffs have the burden to prove that they had a reasonable basis for the position taken on their tax returns. *See Jade Trading I,* 80 Fed.Cl. at 57; *see also Westbrook v. Comm'r,* 68 F.3d 868, 882 (5th Cir.1995) (affirming the substantial understatement penalties when plaintiffs failed to produce sufficient evidence); *Caulfield v. Comm'r,* 33 F.3d 991, 994 (8th Cir.1994) (same); *Stobie Creek,* 82 Fed.Cl. at 717, 721 (noting that a partnership had failed to establish that its reliance on professional tax advice was reasonable under the reasonable cause and good faith defense).

"If a return position is reasonably based on one or more of the authorities set forth in [Treas. Reg.] § 1.6662–4(d)(3)(iii) ..., the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard...." Treas. Reg. § 1.6662–3(b)(3). Plaintiffs argue that they "have met the substantial authority standard and acted with reasonable cause, so they easily meet the standard required to avoid a negligence penalty for any underpayment stemming from the position they initially took but have since conceded." Pls.' Mot. 10. The court has determined, however, supra Part IV.A.1, that the substantial authority defense is unavailable to plaintiffs. Therefore, the court will consider whether plaintiffs had a reasonable basis for their initial return.

Defendant asserts that plaintiffs did not have a reasonable basis, because plaintiffs should have known that the tax savings they realized were "too good to be true." Def.'s Mot. 16. Plaintiffs assert that "[d]efendant's argument assumes significant tax knowledge on the part of the mythical reasonable person, much more than is expected under the Code, Treasury Regulations, and relevant cases." Pls.' Resp. 13. Despite plaintiffs' assertion that they should not be expected to know whether something was "too good to be true," *see id.,* this is precisely the burden that the Treasury Regulation puts on taxpayers, *see* Treas. Reg. § 1.6662–3(b)(1)(ii). A taxpayer is negligent and is liable for the 20% negligence penalty if "[a] taxpayer fails to make a reasonable attempt to ascertain the correctness" of a benefit that a prudent person would find to be "too good to be true." *Id.* § 1.6662–3(a), (b)(1)(ii).

---

**16.** Plaintiffs also assert a defense based on reasonable cause and good faith. Pls.' Mot. 10–11 (citing I.R.C. § 6664(c)(1)). To the extent that plaintiffs' arguments addressing reasonable basis are relevant to the standard for reasonable cause and good faith, the court will discuss them below in Part IV.A.3.

In this case, plaintiffs were engaged in running Constellation, an international business—one that the *New York Times* had characterized as "the nation's second-largest winery." Def.'s First Mot. App'x A, Exh. 2, APP–A–4. Plaintiffs formed Alpha in 2001 and have used Alpha to make investments and generate more than $21 million in profits since its formation. Pls.' Facts ¶¶ 22, 26. As of March 2007, Alpha held approximately $61 million in assets. *Id.* ¶ 26. Plaintiffs Richard and Robert Sand were actively involved in running the business. Pls.' Resp. Third Facts 8. Plaintiffs originally reported a long-term capital loss of $19.8 million dollars, which they conceded should have been reported as a long-term capital gain of $65.5 million dollars. *See* Pls.' Facts ¶ 47; Def.'s Resp. Facts 14–15. Plaintiffs originally claimed a $19.8 million dollar long-term capital loss, as a result of a sale of Constellation stock. Pls.' Resp. Third Facts 14. William Falk, an attorney at Lewis Rice who spent over 250 hours working for the Sands family, concluded that the family had an impressive level of experience and investment sophistication. Pls.' App'x B, Exh. 55, APP–B–1370, ¶ 11 ("The background, education, investment sophistication, and experience of the Sands family were impressive."). Plaintiffs should have known that the tax treatment proposed by Heritage was, in fact, too good to be true.

Plaintiffs further assert that they had a reasonable basis because they relied reasonably on the advice of tax professional in preparing their returns, Pls.' Resp. 13–14, but the applicable regulation states that "[c]onclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority." Treas. Reg. § 1.6662–4(d)(3)(iii). A taxpayer has a reasonable basis, and will not be liable for the negligence penalty, if the taxpayer's initial position is supported by one or more the authorities set forth in the substantial authority section. *Id.* § 1.6662–3(a), (b)(3). In finding that plaintiffs failed to establish the substantial authority defense for their initial position, the court determined that plaintiffs failed to point to a single supporting authority that is recognized in the I.R.C. regulations. *See supra* Part IV.A.1.

The reasonable basis defense limits its consideration to the same sources the substantial authority defenses considers. *See* Treas. Reg. § 1.6662–3(b)(3). Because the plaintiffs have failed to identify a source of authority for their initial position, they have not established a reasonable basis defense. *See id.*

For the foregoing reasons, plaintiffs' Motion regarding the reasonable basis defense is DENIED.

### 3. Reasonable Cause and Good Faith Defense

Plaintiffs assert that none of the accuracy-related penalties of § 6662 apply because plaintiffs acted with reasonable cause and good faith. Pls.' Mot. 10–11. "No penalty may be imposed under [I.R.C. § ] 6662 with respect to any portion of an underpayment upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to, such portion." Treas. Reg. § 1.6664–4(a). The court must make a case-by-case determination regarding reasonable cause and good faith. *Id.* § 1.6664–4(b)(1). Reliance on a professional tax adviser may, but does not necessarily, demonstrate reasonable cause and good faith. *Id.* "For example, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." *Id.* § 1.6664–4(c)(1)(i). A taxpayer will only be considered to have relied with reasonable cause and good faith on the advice of tax professionals if the tax professional considers all pertinent facts and circumstances. *Id.* If a taxpayer knows or has reason to know that the advice is based upon an inaccurate representation, the taxpayer may not rely on that advice to satisfy the good faith and reasonable cause defense. *Id.*

Plaintiffs assert they are entitled to rely on the advice of professional tax advisers regarding issues of tax liability. Pls.' Mot. 11 (quoting *United States v. Boyle (Boyle)*, 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) ("When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable

for the taxpayer to rely on that advice.")). Plaintiffs further asserts that if a taxpayer "receives competent professional advice as to the permissible tax treatment of an item," it is not negligent for a taxpayer to follow that advice to reduce his tax liability. *Id.* at 11–12 (citing *Klamath Strategic Inv. Fund, LLC v. United States*, 568 F.3d 537 (5th Cir.2009); *Henry v. Comm'r*, 170 F.3d 1217, 1220–21 (9th Cir.1999); *Estate of Monroe v. Comm'r*, 124 F.3d 699, 714–15 (5th Cir.1997); *Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir.1995)).

In their Motion, Response and Reply, plaintiffs quote *Boyle*, 469 U.S. at 251, 105 S.Ct. 687, for the proposition that taxpayers are not required to seek a second opinion but can reasonably rely on the advice of a professional when such advice is sought in good faith. Pls.' Mot. 12; Pls.' Resp. 13–14; Pls.' Reply 8.

> Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions.

*Boyle*, 469 U.S. at 251, 105 S.Ct. 687 (internal citations omitted). Reliance on professional advice constitutes reasonable cause only if such reliance was reasonable taking into account all facts and circumstances. Treas. Reg. § 1.6664–4(c)(1). Therefore, Boyle stands for the proposition that reliance on professional advice will constitute a defense when such reliance is reasonable, not that reliance is a bright-line defense to negligence. *See id.*; *Boyle*, 469 U.S. at 251, 105 S.Ct. 687. The court therefore considers whether plaintiffs relied on professional advice in good faith, taking into account all facts and circumstances. *See* Treas. Reg. § 1.6664–4(c)(1).

Plaintiffs argue that taxpayers have no duty to outguess tax professionals, emphasizing that "the reasonableness of a taxpayer's reliance on expert advice regarding the tax laws does not depend upon the ultimate correctness of the advice given." Pls.' Mot. 12–13 (citing *Boyle*, 469 U.S. at 250, 105 S.Ct. 687; *Allison v. United States*, 80 Fed.Cl. 568, 583–84 (2008); *Stanford v. Comm'r*, 152 F.3d 450, 461 (5th Cir.1998); *Klein v. United States*, 94 F.Supp.2d 838, 853 (E.D.Mich. 2000)). Plaintiffs also argue that taxpayers who are attorneys have the same right of reliance on the advice of professionals because most lawyers do not have a sufficient understanding of tax laws. *Id.* at 13 (citing *Bursten v. United States*, 395 F.2d 976, 981 (5th Cir.1968)). Plaintiffs contend that, because they relied on tax professionals in filing their initial returns, they are entitled to the protection of the reasonable cause and good faith defense. Pls.' Mot. 10–12.

Defendant asserts that plaintiffs fail to meet the reasonable cause and good faith defense to the penalties. Def.'s Resp. 9. Defendant notes that, although reliance on the advice of a professional tax adviser may provide reasonable cause and good faith, the taxpayer must demonstrate that, based on the specific circumstances, the reliance on professional advice was reasonable and that the taxpayer acted in good faith. *Id.* Defendant further asserts that because the opinion letters that plaintiffs obtained from Lewis Rice are silent on the issue of § 465, plaintiffs cannot rely on the opinion letters to establish good faith and reasonable cause. *Id.* at 5–6, 9.

 As defendant points out, "when 'a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril.'" Def.'s Mot. 14 (quoting *Neonatology*, 299 F.3d at 234). In *Neonatology*, the United States Court of Appeals for the Third Circuit affirmed the Tax Court's decision that the taxpayers were liable for the negligence penalty under § 6662 because the taxpayers failed to meet their burden of proving reasonable care and good faith. *Neonatology*, 299 F.3d at 234–35. The Court of Appeals affirmed the imposition of accuracy-related penalties even though the taxpayers had relied on the advice of professionals. *Id.* The court summarized the relevant law as follows:

While it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence, *see, e.g., United States v. Boyle*, 469 U.S. 241, 250, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about.

*Id.* at 234 (citing Treas. Reg. § 1.6664–4(c)). Reliance on tax professionals, therefore, is a defense against the negligence penalty, but only if such reliance was itself reasonable in light of all the circumstances. *See* Treas. Reg. § 1.6664–4(c).

■ One relevant inquiry in determining whether plaintiffs had reasonable cause and good faith is whether plaintiffs were involved in a tax shelter. *See Hansen v. Comm'r (Hansen)*, 471 F.3d 1021, 1030–31 (9th Cir.2006) (affirming Tax Court's finding that taxpayers had engaged in a tax shelter and had not established that they acted with reasonable care notwithstanding indirect reliance on tax professionals); *United States v. Solomon (Solomon)*, 825 F.2d 1292, 1297 (9th Cir.1987) (finding it appropriate for the trial court to refuse to give a good faith instruction to the jury after determining that taxpayer had engaged in a tax shelter); *cf. American Boat Co., LLC v. United States (American Boat)*, 583 F.3d 471, 481–83 (7th Cir.2009) (considering plaintiff's involvement in a tax shelter as one factor in determining the reasonable cause and good faith defense). Plaintiffs cite *American Boat* for the proposition that there is no bright-line rule "that any time an adviser incorporates a potential tax shelter into a restructuring plan, the taxpayer may not reasonably rely on that adviser's legal advice and must obtain a second opinion." 583 F.3d at 483; *see* Pls.' Reply 10. It is true that no such bright-line rule exists, but the lack of such a rule does not render plaintiffs' actions reasonable. Plaintiffs' focus on the *American Boat* court's lack of a bright-line rule misses important aspects of that case.

The issue on appeal in *American Boat* was whether the taxpayer had reasonable cause and good faith for its underpayment. 583 F.3d at 474. The Court of Appeals for the Seventh Circuit ultimately decided that the district court did not err in finding that the *American Boat* plaintiff had reasonable cause for its tax position. *Id.* at 486. Before reaching that conclusion, the court engaged in a lengthy discussion of the role of tax professionals and reasonable cause and good faith as a defense to accuracy-related penalties. *Id.* at 480–85. The *American Boat* court summed up: "Relying on a professional, however, will not always get a taxpayer off the hook." *Id.* at 481.

■ As plaintiffs point out, it is well established since *Boyle* that reliance on the advice of a competent and independent professional adviser is a common means of demonstrating reasonable cause and good faith. *Boyle*, 469 U.S. at 251, 105 S.Ct. 687; *see* Treas. Reg. § 1.6664–4(b)(1); *American Boat*, 583 F.3d at 481; *Stobie Creek*, 82 Fed. Cl. at 717–18. The court must look at all of the facts and circumstances to decide if the reliance was reasonable. Treas. Reg. § 1.6664–4(b)(1), (c)(1). The entire determination is a fact-specific one and the court must consider "the quality and objectivity of the professional advice obtained." *American Boat*, 583 F.3d at 481 (internal quotations omitted). "All facts and circumstances must be taken into account" including "the taxpayer's education, sophistication and business experience." Treas. Reg. § 1.6664–4(c)(1). Generally a taxpayer does not need to challenge an independent and competent adviser, *see Boyle*, 469 U.S. at 251, 105 S.Ct. 687, but a taxpayer's reliance is not reasonable if the adviser has an inherent conflict of interest that the taxpayer knew about or should have known about, *see American Boat*, 583 F.3d at 481–82. Therefore, if the court determines that plaintiffs knew or should have known that there was an inherent conflict of interest in relying on the advice of Lewis Rice, plaintiffs will not be able to establish reasonable case and good faith on the basis of the Lewis Rice opinion letters.

■ "What exactly constitutes an 'inherent' conflict of interest is somewhat unde-

fined, but when an adviser profits considerably from his participation in the tax shelter, such as where he is compensated through a percentage of the taxes actually sheltered, a taxpayer is much less reasonable in relaying on any advice the adviser may provide." *Id.* at 482. In *Stobie Creek,* the court upheld the imposition of penalties when the taxpayer relied on the advice of professionals who had a conflict of interest. *Stobie Creek,* 82 Fed. Cl. at 715. Central to the court's decision was that the advisers received fees calculated as a percentage of the decrease in taxes that plaintiffs paid. *Id.* " 'It is well established that taxpayers generally cannot reasonably rely on the professional advice of a tax shelter promoter.' " *Jade Trading I,* 80 Fed.Cl. at 56 (quoting *Edwards v. Comm'r,* 84 T.C.M. (CCH) 24 (2002)). Therefore, if an adviser promoted or otherwise benefitted from the arrangement, a taxpayer cannot rely on the advice of the tax adviser to establish reasonable cause and good faith.

The *American Boat* court ultimately determined that there was not an inherent conflict, based in large part on the fee arrangement in that case. *American Boat,* 583 F.3d at 484, 486. The taxpayer paid the adviser "a large, flat fee .... [the adviser] was not compensated based on a percentage of the tax benefits he produced." *Id.* at 484. Further, in *American Boat,* the taxpayer had originally engaged the adviser for help in 1996 regarding transactions that the IRS did not dispute. *Id.* It was not until 1998, when the taxpayer engaged in Son of BOSS transactions as part of an overall reorganization at the advice of his adviser, that the IRS challenged the transactions. *Id.* The taxpayer also paid a flat fee for the second transaction. *Id.* Finally, the court noted that the taxpayer had enlisted the help of two additional accounting firms to prepare his tax documents. *Id.* at 485 (noting that neither of the two firms raised an objection to the taxpayer's treatment of the transaction).

Plaintiffs engaged the services of Lewis Rice and plaintiffs paid Lewis Rice a flat fee of $300,000. Pls.' Resp. Second Facts 41. Plaintiffs assert that this fee was for, inter alia, the provision of legal advice regarding the income tax consequences of various transactions and for the preparation of tax opinion letters and related documents. *Id.* Defendant asserts that Lewis Rice, in addition to Heritage, was instrumental in structuring the transaction. Def.'s Resp. Facts 18.

In the opinion letters that Lewis Rice issued to plaintiffs, Lewis Rice first stated the relevant facts and then issued its opinion "[b]ased upon the 'Facts' set forth above." E.g., Pls.' App'x B, Exh. 17, APP–B–422; Pls.' App'x B, Exh. 18, APP–B–525; Pls.' App'x B, Exh. 19, APP–B–629. Each of the opinion letters issued by Lewis Rice contained the same relevant paragraphs:

> In retaining Heritage to assist him, [plaintiff] believed that he was retaining a sophisticated, trusted adviser. . . .
>
> . . . .
>
> No legal, tax, accounting, investment, or other adviser has received or will receive compensation that is contingent on any aspect of the Financial Plan receiving the expected tax treatment. Each adviser has been paid or will be paid for the services rendered, and no part of the fees so paid or to be paid is to be refunded, repaid, or reimbursed if the IRS or any other taxing authority successfully challenged any of the contemplated tax consequences of the Financial Plan.

*E.g.,* Pls.' App'x B, Exh. 17, APP–B–420; Pls.' App'x B, Exh. 18, APP–B–523; Pls.' App'x B, APP–B–627. Lewis Rice lists Heritage as one of plaintiffs advisers, and asserts that no adviser received contingent compensation based on the expected tax treatment. *See id.* If plaintiffs had told Lewis Rice that the amount of Heritage's compensation was calculated as a percentage of taxes saved, then Lewis Rice made a material misrepresentation in the relevant facts of its opinion. *See id.* If plaintiffs did not tell Lewis Rice that Heritage's compensation was calculated as a percentage of taxes saved, then plaintiffs failed to provide Lewis Rice with relevant material facts. *See id.*

When an adviser profits from a tax scheme, such as when the adviser is paid based on the percentage of taxes saved, the terms of compensation create a conflict of interest. *See American Boat,* 583 F.3d at

482. Heritage referred plaintiffs to Lewis Rice after promising plaintiffs that they would receive an opinion letter from a top law firm to protect them from certain penalties. *See* Pls.' App'x B, Exh. 55, APP–B–1369; *supra* Parts II.E, F. When a plaintiff's adviser has an economic interest in the transaction, as Heritage did here, that circumstance weighs against the taxpayer's ability to establish a defense of reasonable cause and good faith. *See Stobie Creek*, 82 Fed.Cl. at 715 (finding that plaintiffs were unable to establish a reasonable cause and good faith defense when the tax advisers were paid a percentage of the taxes saved). Accordingly, because Heritage referred plaintiffs to Lewis Rice and because Lewis Rice failed to consider Heritage's payment, which was based on the percentage of the taxes plaintiffs saved, that circumstance weighs against a finding that plaintiffs can rely on the Lewis Rice opinion letters to establish that they acted with reasonable cause and good faith.

Plaintiffs knew or should have known that these facts and circumstances were pertinent to the discussion, and their failure to disclose the terms of the referral and the terms of plaintiffs' compensation to Heritage to Lewis Rice—and the failure of Lewis Rice to consider these terms—harms plaintiffs' reasonable cause and good faith defense. Although plaintiffs were not tax professionals, plaintiffs were actively involved in running a large, international business. *See* Def.'s First Mot. App'x A, APP–A–4. Further, the attorney at Lewis Rice who worked with plaintiffs stated under oath that the "background, education, investment sophistication, and experience of the Sands family were impressive." Pls.' App'x B, Exh. 55, APP–B–1370, ¶ 11. Although taxpayers are generally not expected to second-guess tax professionals, plaintiffs in this case cannot use the opinion letters from Lewis Rice as an absolute bar against liability. A taxpayer is not automatically protected as a result of reliance on a tax professional. *See Allen v. Comm'r*, 925 F.2d 348, 353 (9th Cir.1991). Even if the taxpayer relied on advice of professionals, the taxpayer will still be liable for a negligence penalty if the purported savings are too good to be true. *See David v. Comm'r*, 43 F.3d 788, 789–90 (2d Cir.1995) (upholding negligence

penalty when expert lacked knowledge of the business that the taxpayer invested in). In determining whether plaintiffs acted with reasonable cause and good faith, the court must consider all the facts and circumstances, *see* Treas. Reg. § 1.6664–4(b), and plaintiffs' extensive and sophisticated business experience, Pls.' App'x B, Exh. 55, APP–B–1370, ¶ 11, weighs against a finding that plaintiffs can rely on the Lewis Rice opinion letters to establish the reasonable cause and good faith defense.

Here, the taxpayers paid Heritage 25% of the present and future tax savings. Pls.' Resp. Second Facts 40; *see supra* Parts II.E, F (finding that plaintiffs were advised by employees of Heritage that the fees were based on a percentage of taxes saved). Further, Heritage promised plaintiffs that Heritage's financial plan could eliminate all capital gains taxes on plaintiffs. *See supra* Parts II.E, F (finding that Heritage assured plaintiffs that capital gains taxes could be eliminated). Although plaintiffs relied on the opinion letters from Lewis Rice in addition to Heritage, Heritage referred plaintiffs to Lewis Rice, Pls.' App'x B, Exh. 55, APP–B–1369, ¶ 7, after promising plaintiffs an opinion letter from a law firm that would protect them from liability for penalties, *see supra* Parts II.E, F. Further, in retaining the services of Lewis Rice, plaintiffs failed fully to disclose the terms of the relationship plaintiffs had with Heritage. *Compare* Pls.' Resp. Second Facts 40, *with, e.g.*, Pls.' App'x B, Exh. 17, APP–B–420; Pls.' App'x B, Exh. 18, APP–B–523; Pls.' App'x B, Exh. 19, APP–B–627. William Falk, an attorney with Lewis Rice who worked with plaintiffs, stated that the "Sands family sought legal services in connection with steps they proposed to take to implement a financial plan proposed by [Heritage]." Pls.' App'x B, Exh. 55, APP–B–1370, ¶ 5. In his affidavit, Robert Sands also states that Heritage recommended that plaintiffs engage Lewis Rice and that Lewis Rice would be able to provide an opinion letter to plaintiffs regarding the tax treatment of the transaction. Pls.' App'x B, Exh. 52, APP–B–1352, ¶ 12. Heritage assured plaintiffs that they would receive an opinion letter from a top law firm to protect them

from certain penalties. *See supra* Parts II.E, F. Heritage referred plaintiffs to Lewis Rice so that plaintiffs could obtain an opinion letter regarding the transaction Heritage had structured. *See id.* Plaintiffs, however, failed to disclose to Lewis Rice the full and entire nature of the business arrangement they had with Heritage, in particular, that Heritage had promised elimination of all taxes and that Heritage was being paid a percentage of the taxes plaintiffs saved. *See supra* Parts II.E, F.

Taxpayers may not be required to challenge the findings of tax professionals, *see* Boyle, 469 U.S. at 251, 105 S.Ct. 687, but taxpayers can only rely on such advice as a defense to the accuracy-related penalties of § 6662 if the taxpayer's reliance was reasonable and if the taxpayer acted in good faith, *see* Treas. Reg. § 1.6664-4(b)(1). Given the level of education and sophistication of plaintiffs, the misrepresentation in the Lewis Rice letter of plaintiffs' fee arrangement with Heritage and Heritage's promise to plaintiffs to provide plaintiffs with an opinion letter that would protect plaintiffs from certain penalties, plaintiffs are unable to establish that they acted with reasonable cause and good faith. For the foregoing reasons, plaintiffs' Motion regarding the reasonable cause and good faith defense is DENIED. The court considers only the availability of partnership-level penalties and defenses, and therefore imputes to the partnerships the actions and knowledge of Richard and Robert Sands as the tax matters partner and notice partner, respectively. *See supra* Part III.A.

### B. Government's Motion for Summary Judgment

The government moves for summary judgment on "the single issue of whether, under I.R.C. § 6662, plaintiffs are subject to: (1) a 20% negligence penalty; and/or (2) a substantial understatement penalty for any underpayment of tax resulting from plaintiffs' § 465 concession." Def.'s Mot. 2. Plaintiffs assert that the two penalties are inapplicable to plaintiffs as a matter of law. Pls.' Mot. 8. Plaintiffs assert that "even if one of the penalties could somehow apply under Section 6662, Section 6664 prohibits the imposition of any such penalty since plaintiffs acted reasonably and in good faith in taxing the tax positions at issue." *Id.* Defendant has the burden of production with regards to the penalty. I.R.C. § 7491(c). If the government meets its burden of production, the burden shifts and plaintiffs have the burden of establishing a defense. *Litman v. United States*, 81 Fed.Cl. 315, 318–19 (2008) (requiring the taxpayer to establish that the reasonable cause and good faith defense of § 6664 applies); Jade *Trading I*, 80 Fed.Cl. at 57 (requiring the taxpayer to establish that the substantial authority defense applies). In this case, the court has already considered plaintiffs' defenses in its analysis and decision of plaintiffs' Motion and has found that plaintiffs have failed to establish either defense. *See supra* Part IV.A. The court now considers the government's Motion, viewing the evidence in the light most favorable to plaintiffs as the non-moving parties.

### 1. Short Sale of Securities as a Son of BOSS Tax Shelter

The court first considers whether plaintiffs were engaged in a tax shelter. In its Reply, the government marshals several cases and IRS Notice 2000–44 to support its assertion that the transaction at issue was a tax shelter. Def.'s Reply 2. If the court finds that plaintiffs were engaged in a tax shelter, that finding would affect plaintiffs' ability to assert a good faith defense, even considering the evidence in the light most favorable to plaintiffs. *See Hansen*, 471 F.3d at 1030–31 (affirming Tax Court's finding that taxpayers had engaged in a tax shelter and had not established that they acted with reasonable care notwithstanding indirect reliance on tax professionals); *Solomon*, 825 F.2d at 1297 (finding it appropriate for the trial court to refuse to give a good faith instruction to the jury after determining that taxpayer had engaged in a tax shelter).

The government asserts that plaintiffs "engaged in two Son of BOSS tax shelters promoted to them by Heritage." Def.'s Mot. 3. A Son of BOSS transaction has been described as

a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and sales strategy." There are a number of different types of Son–of–BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis.

*Jade Trading I,* 80 Fed.Cl. at 57 n. 83. The transaction in this case "involved the short sale of United States [Treasury] notes as a vehicle to generate substantial artificial tax benefits to be used to eliminate capital gains." Def.'s Mot. 3 "Plaintiffs object to defendant's repeated characterization of the transactions entered by plaintiffs as 'tax shelters,'" and plaintiffs further assert that the characterization of the transaction as a tax shelter is no longer relevant because plaintiffs have conceded the tax adjustment on a ground other than their basis in stock. Pls.' Resp. 3. Because plaintiffs raise a defense in which they assert their good faith and reasonable cause, the court finds that the question of whether plaintiffs were involved in a tax shelter is relevant, notwithstanding plaintiffs' concessions.

An item is a tax shelter if the primary purpose of the economic decisions shaping the item is the evasion of federal income taxes, I.R.C. § 6662(d)(2)(C), even if there may be other secondary economic purposes, Treas. Reg. § 1.6662–4(g)(2). IRS Notice 2000–44 alerts taxpayers that purported losses arising from an artificially high basis are not allowable for federal income tax purposes. IRS Notice 2000–44, 2000–2 C.B. 255 (stating that "[a]ppropriate penalties may be imposed on participants in these transactions ... including the accuracy-related penalty under § 6662").

Notice 2000–44 describes a situation that would constitute a tax shelter: when "a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership." *Id.* Under this scheme, "a taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased ... options," but the taxpayer's basis is not reduced by the partnership's assumption of the taxpayer's obligation to make a repayment on the securities. *Id.* "The taxpayer purports to have a basis in the partnership equal to the cost of the purchased ... options even ... though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal." *Id.* The taxpayer then claims a loss at the disposition of the partnership interest "even though the taxpayer has incurred no corresponding economic loss." *Id.* "The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences...." *Id.* "Transactions that are the same as or substantially similar to the transactions described in this Notice 2000–44 are identified as 'listed transactions'...." *Id.* "Listed transactions" are transactions of a type that the IRS has determined to be a tax avoidance transaction. I.R.C. § 6707A(c)(2); *Blak Invs. v. Comm'r (Blak),* 133 T.C. No. 19 at * 7 (2009).

The court has not been able to find binding precedent concerning a short sale of securities that is parallel in all respects to the transactions plaintiffs engaged in, but the court has found several persuasive authorities which recognize that Son of BOSS transactions are to be viewed as listed transactions under IRS Notice 2000–44, 2000–2 C.B. 255. The United States Tax Court (Tax Court) recognized in *Kligfeld Holdings v. Comm'r (Kligfeld),* 128 T.C. 192, 2007 WL 1556083 (2007) that Son of Boss transactions had been included as "listed transactions":

> In 2000, the IRS released Notice 2000–44, 2000–2 C.B. 255, which gave notice that Son–of–BOSS transactions were officially "listed," meaning the IRS would aggressively pursue all taxpayers who had engaged in them. The IRS reasoned that the transactions [did not] reflect economic reality, and the disregarded liabilities must

be taken into account when computing basis.

*Kligfeld,* 128 T.C. at 198. In *Blak,* the Tax Court determined that a short sale of Treasury Notes, when used for the primary economic purpose of inflating a taxpayer's basis in an investment, is a Son of BOSS transaction and is a listed transaction under IRS Notice 2000–44. *Blak,* 133 T.C. No. 19 at *10–11 (2009); *see* IRS Notice 2000–44, 2000–2 C.B. 255. The *Blak* Court determined that a transaction involving the short sale of securities was economically similar to the transactions described in Notice 2000–44, even though the examples in the Notice involved purchasing and writing of options rather than the short sale of securities. *Id.; see also Petaluma FX Partners LLC v. Comm'r,* 591 F.3d 649, 650 (D.C.Cir.2010) (treating Son of BOSS transactions as a tax shelter).

Notice 2000–44 includes as "listed transactions" transactions that are the same or substantially similar to the transactions specifically described in the Notice. IRS Notice 2000–44, 2000–2 C.B. 255. The IRS defines the term "substantially similar" to mean "any transaction that is expected to obtain the same or similar types of tax benefits and that is either factually similar or based on the same or similar tax strategy." *See id.; Stobie Creek,* 82 Fed.Cl. at 653. The Blak court concluded that there were substantial similarities between a short sale of securities— the transaction used by the taxpayer in Blak and by the plaintiffs in this case—and the transactions described in Notice 2000–44 and therefore should be treated as a listed transactions. *Blak,* 133 T.C. No. 19 at * 11–12.

The United States Court of Appeals for the Federal Circuit dealt with a case involving a similar transaction in *Salman Ranch Ltd. v. United States (Salman),* 573 F.3d 1362 (Fed.Cir.2009). The issue in *Salman* was whether the "IRS was entitled to the benefit of the six-year statute of limitations of I.R.C. §§ 6501(e)(1)(A) and 6229(c)(2)." *Salman,* 573 F.3d at 1363. The majority determined that the FPAA at issue was un-

timely and invalid and therefore never considered the merits of the case or the economic substance of the transaction. *Id.* at 1363, 1377. The dissenting judge addressed the merits of the case and the economic substance of plaintiffs' transaction and agreed with the Court of Federal Claims in *Jade Trading I,* 80 Fed.Cl. at 14, "that a 'Son of BOSS' scheme lacked economic substance." *Salman,* 573 F.3d at 1382 (Newman, J., dissenting). Much like the current case, plaintiffs in *Salman* "entered into short sale transactions involving U.S. Treasury Notes." *Id.* at 1364. The FPAA in *Salman* asserted that "[b]y inflating its basis in the ranch by a portion of the short sale proceeds while failing to offset that basis by the assumption of its obligation to close the short sale, the Partnership allegedly created an improper tax shelter." *Id.* at 1365. The transaction by the *Salman* plaintiffs, whereby they inflated the basis through the use of a short sale, is substantially similar to plaintiffs' transaction in the current case.

In *Clearmeadow,* this court found "as a matter of law, that the Son of BOSS transactions ... lacked economic substance." *Clearmeadow,* 87 Fed.Cl. at 514 (describing of a Son of BOSS transaction). The court found that the gross valuation overstatement penalty of § 6662 was applicable. *Id.* This court also examined Son of BOSS transactions in *Jade Trading I,* 80 Fed.Cl. at 57 n. 83.[17] The court in *Jade Trading I* characterized Son of BOSS transactions as " 'the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership.' " *Id.* (quoting *Salman,* 79 Fed.Cl. at 192 n. 5). The *Jade Trading I* court concluded that the transaction wholly lacked economic substance and determined that tax avoidance was a significant purpose of the transaction. *Id.* at 14, 57. The court determined that "the transaction meets the definition of a tax shelter, and [p]laintiffs may avoid imposition of the substantial understatement penalty only if they show both that their reporting position was supported by 'substantial authority' and that they 'reasonably believed that the

---

17. On appeal, the Court of Appeals for the Federal Circuit agreed with the trial court that the transaction at issue was a tax shelter but did not address the basis for that aspect of its opinion. *Jade Trading II,* 598 F.3d at 1374 (noting that "the tax shelter here involved four steps").

tax treatment of such item … was more likely than not the proper treatment.'" *Id.* at 57 (quoting I.R.C. § 6662(d)(2)(C)(i)(II)).

In this case, plaintiffs transferred shares of Constellation and interests in their respective Paine Webber accounts to RRMC Group. Pls.' Resp. Second Facts. 22–23. The Paine Webber accounts included the proceeds that each plaintiff received from the short sale of Treasury Notes. *Id.* at 20. The parties agree that RRMC Group sold the Constellation stock for $74,862,863 dollars. *Id.* at 25. On May 14, 2008 plaintiffs conceded that they should have reported a long-term capital gain in 2001 of $65,539,019, the amount asserted by defendant. Def.'s Resp. Facts 15–16. Plaintiffs assert that they did not originally reduce the basis in RRMC Partners by the contingent obligation to cover the short sale positions because contingent obligations are not liabilities that reduce the basis. Pls.' Resp. Second Facts. 25–26. When a partnership treats liabilities as uncertain—as plaintiffs did here—in order to disregard those liabilities in computing basis, that treatment inappropriately inflates the partners' basis. *See Salman,* 79 Fed.Cl. at 192 n. 5. Plaintiffs' treatment of the contingent obligation to repay the short sale of U.S. Treasury securities is the hallmark of a Son of BOSS transaction: the taxpayer creates a substantial positive basis in a partnership interest through the transfer of uncertain liabilities. *See* IRS Notice 2000–44, 2000–2 C.B. 255. Accordingly, this transaction is substantially similar to the transactions described in Notice 2000–44 and therefore is a "listed transaction."

The court finds that the transfer of short sale proceeds to RRMC Group without the transfer of the related contingent obligations is a Son of BOSS transfer that created a tax shelter. For the foregoing reasons, the court finds that plaintiffs were ENGAGED in a TAX SHELTER.

### 2. Substantial Understatement Penalty and the Substantial Authority Defense

To avoid the substantial understatement penalty, plaintiffs have the burden to establish both that their "reporting position was supported by substantial authority and that they reasonably believed that the tax treatment of such an item … was more likely than not the proper treatment." *Jade Trading I,* 80 Fed.Cl. 57; *see* Treas. Reg. § 1.6662–4(g)(1)(i). Plaintiffs may be able to avoid the substantial understatement penalty if they reasonably relied on the opinions of tax advisers. *See* Treas. Reg. § 1.6664–4(c); I.R.C. § 6664. Plaintiffs failed to establish that they were entitled to either defense as a matter of law. *See supra* Part IV.A.1. Here, in considering defendant's Motion for Summary Judgment, the court reviews all facts in the light most favorable to plaintiffs, the nonmoving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

A taxpayer is liable for a 20% substantial understatement penalty if the underpayment of tax meets the requirements of § 6662(d): the understatement must exceed the greater of 10% of the tax required to be shown on the refund for the taxable year or $5000. I.R.C. § 6662(d)(1)(A). A taxpayer can exclude from this amount any item for which there is substantial authority to support the taxpayer's tax treatment of the item. *Id.* § 6662(d). If the understatement of taxes owed is the result of a tax shelter, as it is here, *see supra* Part IV.B.1, the taxpayer must establish that there was substantial authority for the tax treatment, and the taxpayer reasonably believed that the reported treatment of an item was more likely than not the proper treatment, *see* Treas. Reg. § 1.6662–4(g)(1); *see* I.R.C. § 6662(d)(2)(C)(i). Plaintiffs used a Son of BOSS tax shelter in order to minimize the amount paid in federal income taxes. *See supra* Part IV.B.1. However, plaintiffs may establish a defense to any accuracy-related penalty, regardless of whether a tax shelter was used, if they had reasonable cause for their actions and acted in good faith, I.R.C. § 6664(c)(1), a defense the court considers in greater detail below, *see Infra* Part IV.B.4.

"[F]or the Commissioner to meet his burden of production, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." *Higbee v. Comm'r,* 116 T.C. 438, 446, 2001 WL 617230 (2001). In support of its assertion that plaintiffs sub-

stantially understated their tax in their initial returns, the government produced the tax returns of partnership income of Alpha, Beta, MLRR, and Mickey Management for the years at issue. Def.'s First Mot. App'x A, Exhs. 18–23, APP–A–214 to –283. Plaintiffs have conceded defendant's FPAA adjustment on the basis of § 465. Alpha Amend. Compl. 17–18. Rather than challenge the calculation, plaintiffs rely entirely on the defenses to the substantial understatement penalty: the substantial authority defense, Pls.' Mot. 8–10, 16–17, and the reasonable cause and good faith defense, id. at 10–15. Defendant has met its burden, see I.R.C. § 7491(c), and the remaining issue is whether there is substantial authority for any portion of the understatement, I.R.C. § 6662(d)(2)(B). The court will therefore consider whether the amount of plaintiffs' substantial understatement should be reduced on the basis of substantial authority.

Substantial authority is an objective standard and must be based on one of the sources of authority listed in the I.R.C. See Treas. Reg. § 1.6662–4(d)(3)(ii). To determine whether there was substantial authority for plaintiffs' position, the court must examine the relative weight of pertinent authorities supporting and opposing the position asserted by plaintiffs. See id. § 1.6662–4(d)(3). Reliance on advice by tax professionals is specifically excluded in deciding whether substantial authority exists for a particular tax treatment. See id. § 1.6662–4(d)(3)(iii).

Plaintiffs assert that "there was substantial authority for taking the position that § 465 did not preclude or defer the losses originally claimed by plaintiffs on their returns." Pls.' Mot. 9. Plaintiffs contend that because Lewis Rice concluded that § 465 was inapplicable to plaintiffs, plaintiffs reasonably relied on Lewis Rice's conclusion and therefore are not liable for accuracy-related penalties under § 6662. See id. at 4–5. The opinion letters authored by Lewis Rice concluded that it was more likely than not that RRMC Group would be viewed as having "a basis in assets deemed to have been received in liquidation of its interest in Partners." Id. at 4. Plaintiffs assert several times that it is reasonable for taxpayers to rely on the advice of tax professionals. See id. at 10–11. Plaintiffs misstate the substantial authority standard. Treasury Regulation § 1.6662–4(d)(3)(iii) lists the types of authority that "are authority for purposes of determining whether there is substantial authority for the tax treatment of an item;" it further states that "legal opinions or opinions rendered by tax professional are not authority." Treas. Reg. § 1.6662–4(d)(3)(iii).

Plaintiffs fail to point to any of the listed types of authority in their Motion, see Pls.' Mot. 8–10, but do cite several authorities in their Response, Pls.' Resp. 5–10.[18] Plaintiffs assert that there is substantial authority for the position that they initially took with regard to § 465. Id. Plaintiffs rely on three sources of authority for their position: the text of § 465; the Senate Report, demonstrating Congressional intent; and Hambrose.[19] Id. at 7–9. The court will discuss each in turn.

Plaintiffs assert that § 465(a) limits applicability of § 465 to individual and certain corporate taxpayers and that § 465 is therefore inapplicable to plaintiffs as partnership and did not apply to preclude or defer the capital losses claims on their returns in 2001 and 2002. Pls.' Resp. 7. As discussed above in greater detail, see supra Part IV.A. 1.a, although § 465(a) specifies individuals and

---

18. Plaintiffs also cite to Plaintiffs' Response to United States' Motion for Summary Judgment … and Cross–Motion for Summary Judgment, Dkt. No. 35, filed in 2007, which in turn cites four cases. Plaintiffs' Response to Defendant's Motion for Summary Judgment on Penalties (Pls.' Resp.), Dkt. No. 185, 10. However, these cases are inapplicable because they address the appropriate treatment of I.R.C. § 752 and I.R.C. § 23, neither of which is at issue in this case. See Alpha I v. United States, 89 Fed.Cl. 347, 357 (2009); see also supra Part IV.A.1.b.

19. Plaintiffs cite several authorities that are not included on the Treasury Regulation's list of appropriate authorities to use in determining whether substantial authority exists. See Treas. Reg. § 1.6662–4(d)(3)(iii); supra Part IV.A.1.c.; see also Pls.' Mot. 5, 10. These authorities are irrelevant and the court does not address them again.

certain C corporations, the text of § 465 as a whole applies to "any taxpayer engaged in the activit[ies]" listed in § 465(c). Section 465(c) applies to "*any taxpayer* engaged in the activity of ... carrying on a trade of business for the production of income." *Id.* § 465(c)(1), (c)(3)(A) (emphasis added). Further, several subsections of § 465 outline specific rules for partnerships. *See, e.g.,* I.R.C. § 465(b)(6)(C), (c)(2)(B). Accordingly, the court does not find persuasive plaintiffs' argument that § 465 is inapplicable on its face to partnerships.

Plaintiffs also cite Senate Report Number 938 to support its position that § 465 is inapplicable to them. Pls.' Resp. 8–9 (citing S.Rep. No. 94–938, at 48). Plaintiffs contend that the Senate Report provides support for the proposition that Congress intended for the at-risk rules to apply only to partners' share of the partnership losses and not to partners' bases in their partnership items. *Id.* at 9. The adjustment at issue is an adjustment to plaintiffs' basis in Constellation stock rather than the basis in the partnership. *See* Pls.' Resp. Second Facts 25–26. Accordingly, the court does not find plaintiffs' assertions that the Senate Report supports plaintiffs' initial position to be persuasive.

Plaintiffs also cite *Hambrose* for the proposition that § 465 does not apply to defer or disallow losses at a partnership level. Pls.' Resp. 8 (citing *Hambrose,* 99 T.C. at 310). As discussed in greater detail above, *see supra* Part IV.A. 1.b, the court in *Hambrose* determined that the disallowance—based on the facts and circumstance of that case—was better decided at the partner level, *Hambrose,* 99 T.C. at 309–10, 312. Because the partners in this case conceded the adjustment and were family members who took part in the same short sales on the same day, the court finds that the applicability of § 465 is better determined at the partnership level and that *Hambrose* is not authority supporting plaintiffs' initial position. As discussed in greater detail above, *see supra* Parts IV. A.1.bc, the court does not find these sources persuasive to establish support for plaintiffs' initial position.

Viewing the evidence in the light most favorable to the plaintiffs, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348, the court finds that defendant has met its burden of production with respect to the substantial understatement penalty. The court further finds that plaintiffs have failed to put forth sufficient pleadings, depositions, or other evidence to establish that there was substantial authority for their initial position. *See* RCFC 56(c). Because the court finds that substantial authority does not support the tax treatment claimed by plaintiffs in their returns, the court need not address whether plaintiffs reasonably believed that the tax treatment claimed was more likely than not the proper treatment. To the extent that substantial understatement penalties are to be calculated at subsequent partner-level proceedings, the taxpayers are not entitled to a reduction for any understatement that is attributable to substantial authority. Whether the reasonable cause and good faith exception applies to defeat the substantial understatement penalty is addressed below. *See infra* Part IV.B.4

For the foregoing reasons, defendant's Motion regarding the substantial authority defense is GRANTED.

3. Negligence Penalty and the Reasonable Basis Defense

The government has the burden of production to prove that plaintiffs were negligent by failing to make a reasonable attempt to comply with the law. *See* I.R.C. §§ 6662(c), 7491(c). Negligence occurs when a taxpayer fails to make a reasonable attempt to comply with the provisions of the I.R.C. or to exercise ordinary and reasonable care. Treas. Reg. § 1.6662–3(b)(1). Negligence is strongly indicated where the tax treatment would seem to be "too good to be true" to a reasonable and prudent person. *Id.* § 1.6662–3(b)(1)(ii). The government asserts that "[a]ny reasonable person would know that artificially inflating the basis in stock by nearly 3700% ... and artificially inflating the basis in stock by only 900% ... to eliminate tax on capital gains is impermissible." Def.'s Mot. 17.

"[F]or the Commissioner to meet his burden of production, the Commissioner must come forward with sufficient evidence indi-

cating that it is appropriate to impose the relevant penalty." *Higbee,* 116 T.C. at 446. In support of its assertion that plaintiffs failed "to exercise ordinary and reasonable care in the preparation of [their] tax return," *see* Treas. Reg. § 1.6662–3(b)(1), the government produced the tax returns of partnership income of Alpha, Beta, MLRR, and Mickey Management for the years at issue, *see* Def.'s First Mot. App'x A, Exhs. 18–23, APP–A–214 to –283. The government produced transcripts of conversations between plaintiffs and Heritage employees concerning the elimination of plaintiffs' taxes, and the acquisition of opinion letters from a top law firm to protect plaintiffs from certain penalties. Def.'s Resp. App'x B, Def.'s Exhs. 26–29, APP–B–1 to –130. The government also produced the agreement between Heritage and plaintiffs, signed by Mr. Kornman, Chief Executive and President of Heritage, Richard Sands and Jennifer Sands stating that Heritage would implement tax strategies for a fee of 25% of the taxes that plaintiffs saved. Def.'s First. Mot. App'x A, Exh. 9, APP–A–48 to –61. The court also has before it the opinion letters from Lewis Rice which assert that plaintiffs consulted with Heritage in implementing the tax strategies and that no consultants were paid based on percentage of taxes saved, a material misrepresentation about which plaintiffs knew or should have known. *See* Pls.' App'x B, APP–B–415 to –1039. The court also has before it information demonstrating that plaintiffs, particularly Richard Sands, had considerable business experience and sophistication. Def.'s First Mot. App'x A, APP–A–4 to –5; Pls.' App'x B, Exh. 55, APP–A–1370, ¶ 11; *see* Pls.' Resp. Third Facts 8. Based on the foregoing, the court concludes that the government has met its burden of production that plaintiffs were negligent or in disregard of rules or regulations under I.R.C. § 6662.

The burden shifts to plaintiffs to prove that there is a defense available to them. *See Conway v. United States,* 326 F.3d 1268, 1278 (Fed.Cir.2003); *Jade Trading I,* 80 Fed. Cl. at 57. Plaintiffs assert that they had a reasonable basis for their original tax treatment and that they "met the substantial authority standard and acted with reasonable cause, so they easily meet the standard re-

quired to avoid a negligence penalty." Pls.'s Mot. 10. "If a return position is reasonably based on one or more of the authorities set forth in [the substantial authority section] ..., the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard...." Treas. Reg. § 1.6662–3(b)(3). Although plaintiffs provide no relevant authority in the section of their Response addressing the negligence penalty, they refer to the authorities listed in the substantial authority section of their Motion. Pls.' Mot. 10, 12. Because the court found that none of the authorities that plaintiffs rely on in their substantial authority section provides support for their initial tax treatment, *see supra* Part IV.B.2, plaintiffs are unable to establish that they had a reasonable basis for their original positions on their tax returns.

Viewing the evidence in the light most favorable to the plaintiffs, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348, the court finds that defendant met its burden of production with respect to the negligence penalty and that plaintiffs have failed to put forth sufficient pleadings, depositions, or other evidence to establish that there was a reasonable basis for the position they took. *See* RCFC 56(c). The court finds that there is not a reasonable basis to support the tax treatment claimed by plaintiffs in their returns.

For the foregoing reasons, defendant's Motion regarding the negligence penalty and the reasonable basis defense is GRANTED.

### 4. Reasonable Cause and Good Faith Defense

Reliance on the opinion of professional tax advisers may serve as a defense to the accuracy-related penalties of § 6662 if plaintiffs can demonstrate they acted with reasonable cause and good faith. *See* Treas. Reg. § 1.6664–4(b)(1) ("Reliance on ... professional advice ... constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."). Reliance on the opinion of professional tax advisers does not necessarily demonstrate reasonable cause

and good faith, however, and "[i]n no event will a taxpayer be considered to have reasonably relied in good faith on advice" of a tax professional unless all facts and circumstances were considered and no unreasonable assumptions were made. *Id.* § 1.6664–4(c)(1). "The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances." *Id.* § 1.6664–4(c)(1)(i). A taxpayer will not be able to meet the requirements of the reasonable cause and good faith defense "if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." *Id.*

Before meeting with Lewis Rice, plaintiffs had several meetings with employees of Heritage. Pls.' Resp. Third 9. During these meetings Heritage employees told plaintiffs that they could eliminate plaintiffs' taxes in exchange for 25% of the tax plaintiffs saved. *See supra* Parts II.E, F (finding that Mr. Decker and Mr. Seaberg conveyed to plaintiffs a promise that Heritage could eliminate plaintiffs' taxes). Before being referred to Lewis Rice, plaintiffs were told that Heritage would arrange for opinion letters from a top law firm—not to ensure that the tax treatment was legal—but to protect plaintiffs from the very penalties at issue in this case. *See supra* Parts II.E, F (finding that plaintiffs were told that Heritage would secure opinion letters from a top law firm to protect plaintiffs from certain penalties). The facts section of the Lewis Rice opinion letters, upon which the conclusions are based, asserts that plaintiffs met with Heritage for the purpose of tax advice. *See, e.g.,* Pls.' App'x B, Exh. 17, APP–B–415 to –422. The opinion letters do not mention that plaintiffs paid Heritage a percentage of taxes saved (and in fact indicate the opposite) or that Heritage assured plaintiffs that Heritage would secure opinion letters to release plaintiffs from penalties. *See, e.g., id.*

In *Stobie Creek*, plaintiffs asserted that the reasonable cause and good faith defense "should shield the partnership from accuracy-related penalties because the partnership, through [the managing partner], was entitled to rely on the advice of its professional tax advisors." *Stobie Creek,* 82 Fed.Cl. at 718. This is the same argument plaintiffs put forward in this case. Pls.' Mot. 10–15. In *Stobie Creek,* the court noted that the opinion letter that the plaintiffs purported to rely on, was "a 111–page document, ... replete with legal analysis." 82 Fed.Cl. at 720. Although the *Stobie Creek* court also noted that the transactions at issue were made for "substantial nontax business reasons," it nevertheless determined that "the advice given by [the managing partner]'s tax advisors [did] not satisfy the minimum requirements set forth in Treasury Regulation § 1.6664–4(c)(1)." *Id.* at 720–21. The court determined that the advice was based on representations or assumptions that the managing partner knew or had reason to know were false or unlikely to be true and, consequently, the reasonable cause and good faith defense was unavailable to the partnership. *Id.*

Taking the evidence in the light most favorable to plaintiffs, there are facts and circumstances that plaintiffs knew or should have known to be important that were not included in the Lewis Rice opinion letters— in particular, that plaintiffs paid Heritage based on a percentage of taxes saved. Pls.' Resp. Second Facts 40–41. The court found that Heritage assured plaintiffs that plaintiffs would be able to eliminate capital gains taxes using Heritage's strategies. *See supra* Parts II.E, F. The court also found that Heritage informed plaintiffs that plaintiffs would be provided with an opinion letter from a top law firm that would serve to shield plaintiffs from certain penalties. *See supra* Parts II.E, F. The court determined that the opinion letters fail to mention that Heritage was paid based on a percentage of plaintiffs' taxes saved. *See supra* Parts II.E, F; *see also, e.g.,* Pls.' App'x B, Exh. 17, APP–B–422. Based on the absence from the Lewis Rice opinions of facts that plaintiffs knew or should have known and on plaintiffs' impressive "background, education, investment sophistication, and experience," Pls.' App'x A, Exh. 55, APP–B–1370, ¶ 11, plaintiffs may not rely on the Lewis Rice opinion letters to provide support for the contention that they reasonably relied on the advice of a tax professionals. Because plaintiffs relied entirely upon the opinion letters from Lewis Rice to

establish that they acted with reasonable cause and good faith, *see* Pls.' Mot. 10–18, plaintiffs are unable to establish that the reasonable cause and good faith defense is available to them.

Taxpayers are generally not required to challenge the findings of tax professionals, *see Boyle*, 469 U.S. at 250–51, 105 S.Ct. 687, but taxpayers can rely on such advice as a defense to the accuracy related penalties of § 6662 only if the taxpayer's reliance was reasonable and if the taxpayer acted in good faith, *see* Treas. Reg. § 1.6664–4(b)(1). Given the level of education and sophistication of plaintiffs, the misrepresentation in the Lewis Rice letter of plaintiffs' fee arrangement with Heritage and plaintiffs knowledge that Heritage's transaction sought the elimination of taxes, the reasonable cause and good faith defense is inapplicable. For the foregoing reasons, defendant's Motion regarding the reasonable cause and good faith defense is GRANTED.

The amount of any penalty must be determined at the partner level where individual partner defenses may be asserted, including the defense that individual partners acted with reasonable cause and good faith. Any partner who has a defense that is "personal to the partner" may raise this in a partner-level proceeding. *See* Temp. Treas. Reg. § 301.6221–1T(d). The court considers only the availability of partnership-level penalties and defenses and imputes to the partnerships the actions and knowledge of Richard and Robert Sands as the tax matters partner and notice partner respectively. *See supra* Part III.A.

## V. Conclusion

For the reasons stated in Part IV, the court DENIES plaintiffs' Motion and GRANTS defendant's Motion, finding that plaintiffs were engaged in a tax shelter, that the substantial understatement accuracy-related penalty of § 6662(b)(1) and the negligence accuracy-related penalty of § 6662(b)(2) apply, and that the substantial authority defense, the reasonable basis defense and the reasonable cause and good faith defense are not available to plaintiffs.

The parties are directed to file a Joint Status Report (JSR) or, if the parties cannot agree, separate status reports, on or before Thursday, June 10, 2010, to propose further proceedings necessary to resolve the case.

IT IS SO ORDERED.

### TABLE OF CONTENTS

I. Background .................................................. 284
 A. Procedural Background ................................ 284
 B. Pending Motions ..................................... 286
 C. Factual Background .................................. 287
 1. The Heritage Discussions ....................... 287
 2. The First Transaction .......................... 288
 3. The Second Transaction ......................... 289
 4. The FPAAs and Plaintiffs' Concessions .......... 290
 5. The Lewis Rice Opinion Letters ................. 291

II. Motion to Strike .......................................... 291
 A. Background .......................................... 291
 B. Legal Standards ..................................... 293
 C. Admissibility for Summary Judgment .................. 294
 D. Discovery Sanction .................................. 295
 E. Transcript Assertions ............................... 296
 1. Conversation with Chester Decker ............... 296
 2. Conversations with Tim Seaberg ................. 297
 F. The "Gist" of the Transcript Information ............ 298

III. Legal Standards .......................................... 298
 A. Jurisdiction ........................................ 298
 B. Cross Motions for Summary Judgment .................. 300
 C. Accuracy–Related Penalties .......................... 301

1. Negligence Penalty .............................................. 302
2. Substantial Understatement Penalty ................................. 303
3. Substantial Authority Defense to the Substantial Underpayment
 Penalty ...................................................... 303
4. Tax Shelter Items .............................................. 304
5. Reasonable Cause and Good Faith Exception ......................... 304

IV. Discussion........................................................ 305
A. Plaintiffs Motion for Summary Judgment ................................. 306
 1. Substantial Understatement Penalty and Substantial Authority
 Defense ................................................... 306
 a. Statutory Analysis ...... .............................. 308
 b. Case Law Analysis....................................... 309
 c. Authority Outside the Scope of Treasury Regulation § 1.6662–4..... 310
 d. Conclusion .............................................. 311
 2. Negligence Penalty and the Reasonable Basis Defense ................. 312
 3. Reasonable Cause and Good Faith Defense ......................... 313
B. Government's Motion for Summary Judgment ............................. 318
 1. Short Sale of Securities as a Son of BOSS Tax Shelter ................. 318
 2. Substantial Understatement Penalty and the Substantial Authority
 Defense ................................................... 321
 3. Negligence Penalty and the Reasonable Basis Defense ................. 323
 4. Reasonable Cause and Good Faith Defense ......................... 324

V. Conclusion ....................................................... 326